# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-40905

United States Court of Appeals
Fifth Circuit

**FILED**

May 19, 2016

Lyle W. Cayce
Clerk

JP MORGAN CHASE BANK, N.A.,

Plaintiff - Appellee

v.

DATATREASURY CORPORATION,

Defendant - Appellant

Appeal from the United States District Court
for the Eastern District of Texas

Before DAVIS, SMITH, and HIGGINSON, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

In this case we review the district court's interpretation of a most favored licensee ("MFL") clause in a license agreement which allows Plaintiff-Appellee JP Morgan Chase Bank, N.A. ("JPMC") to use Defendant-Appellant DataTreasury Corporation's ("DTC") patented check processing technology. The negotiated license agreement granted JPMC unlimited use of the patented technology both as to time and volume of use for a lump sum, which JPMC paid in installments under the agreement. In its suit against DTC for breach of contract, JPMC invoked its rights under the MFL clause based on DTC's granting a similar unlimited license to another entity for a lesser lump sum than JPMC paid. We agree with the district court that after comparing these

two lump-sum license agreements, the later agreement is indeed more favorable, and JPMC therefore is entitled to a refund from DTC for the difference between the amount it paid for its license and the lesser amount bargained for in the later license agreement. We find no error and affirm.

## I.    Factual background and procedural history

DTC holds several patents applicable to electronic check-processing systems. In the late 1990s, the head of DTC reportedly met with several banks to discuss the use of DTC's patented technology, but the banks declined and instead created their own check-processing system. DTC sued JPMC and several other banks, including Bank One Corporation ("BOC"), which soon merged into JPMC, alleging willful patent infringement. Facing substantial potential liability (in DTC's estimation, a nine-figure amount and perhaps treble that for willful infringement), JPMC was the first bank to reach a settlement agreement with DTC in 2005.

As part of the settlement, JPMC entered into a consent judgment in which it admitted the patents were valid and enforceable and that JPMC had infringed them. It also entered into a license agreement permitting JPMC unlimited use of DTC's patented technology going forward. To protect JPMC from the risk that DTC would enter into a more favorable license with a later settling defendant, the license agreement included a most-favored licensee ("MFL") clause (also referred to as a most favored nations, or "MFN," clause), which forms the basis for this dispute. The settlement allowed both DTC and JPMC to avoid the risks and costs of litigation, drastically reduced JPMC's potential liability, and paved the way for DTC to settle with the other banks. DTC later obtained several hundred million dollars through the various settlements.

2

No. 15-40905

In the district court's superseding memorandum opinion and order in this case, entered February 5, 2015, it set out the relevant facts more fully as follows:

> On June 28, 2005, JPMC and BOC each entered into settlement agreements with DTC resolving patent infringement claims arising from certain of DTC's patents. The parties also entered into the License Agreement, allowing JPMC to use DTC's patents for a total consideration of $70 million. Although the $70 million altogether was a lump-sum payment for unlimited use of DTC's patents and not a "running royalty" paid per-use, the parties agreed to payment in installments: $25 million in 2005 under the BOC Settlement and Release Agreement; $5 million in 2005 under the JPMC Settlement and Release Agreement; and $5.5 million each year from 2006 to 2011, with a final $7 million payment in 2012. Together, these payments are the full consideration for JPMC's use of DTC's patents.[1]

Section 10.8 of the License Agreement provided that breaches of the agreement by either party generally could be cured, "other than the failure of JPMC to make the payments required by the Settlement and Release Agreement between DTC and JPMC," which breach "shall result in a termination of the licenses and rights granted to JPMC and its Subsidiaries in this Agreement." Thus, JPMC committed to pay the entire $70 million royalty from the outset and could not decide to stop paying even if it no longer desired to use DTC's patents. Under the unambiguous terms of the License Agreement, JPMC was required to pay the full $70 million or lose the license entirely. The district court continued:

> Section 9 of the License Agreement contains the MFL at issue, which states:

---

[1] *JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*, 79 F. Supp. 3d 643, 646-47 (E.D. Tex. 2015) (citations dond footnotes omitted, emphasis added). The district court had entered an order on March 6, 2014, which interpreted the MFL clause, but it stated that the February 5, 2015 order "supersedes the March 6, 2014, Order in its entirety." *Id.* at 649.

No. 15-40905

**9. Most Favored Licensee**

If DTC grants to any other Person a license to any of the Licensed Patents, it will so notify JPMC, and JPMC will be entitled to the benefit of any and all more favorable terms with respect to such Licensed Patents. JPMC agrees that $.02 to $.05 per Transaction is a reasonable royalty under the license granted herein, and JPMC makes no representation as to what pro-rata share of such royalty is attributable to any portion or sub-part of such Transaction. The notification required under this Section shall be provided by DTC to JPMC in writing within thirty (30) days of the execution of any such third party license and shall be accompanied by a copy of the third party license agreement, which may be redacted by DTC if necessary to comply with any judicial order or other confidentiality obligation. The MFN shall be applied within thirty (30) days from the date this provision is recognized in accordance with Section 10.7.

Section 10.1 requires notices to be by fax and express delivery to both JPMC's Office of General Counsel and to outside counsel at Skadden, Arps, Slate, Meagher & Flom LLP (Skadden). Section 10.7 is a choice of law and forum clause requiring that the License Agreement be construed under Texas law, and that jurisdiction and venue exist solely in the United States District Court for the Eastern District of Texas, Texarkana Division.

After entering into the License Agreement, DTC separately entered into several other licensing agreements (the Subsequent Licenses) involving the same patents but at different lump sum price terms. Notably here, on October 1, 2012, DTC entered into such a license agreement with non-party Cathay General Bancorp (Cathay). The lump sum price term for Cathay's sole use (i.e., not extending to any after-acquired entities) was $250,000. However, as discussed below, the full consideration under the Cathay license also required additional payments under an established formula for any additional entities Cathay acquired later. No such provision exists in the JPMC–DTC License Agreement.

On November 29, 2012, JPMC filed the instant lawsuit for breach of contract against DTC, alleging that DTC had failed to notify

4

JPMC of the Subsequent Licenses and that "many of the Subsequent Licenses were granted on terms substantially more favorable than those afforded to JPMC." Complaint at 4. Of note, the Cathay license agreement had not been noticed to JPMC, but was produced after JPMC initiated this lawsuit.

In its instant motion for summary judgment, JPMC seeks the benefit of the isolated price term granted to Cathay, and summary judgment on DTC's affirmative defenses and counterclaims. To obtain that benefit, JPMC contends that its $70 million lump-sum price term must be retroactively replaced with Cathay's $250,000 lump-sum price term and the balance refunded. JPMC also moved to dismiss DTC's counterclaims.

DTC has filed three cross-motions for partial summary judgment on: (1) its affirmative defense of the statute of limitations; (2) its affirmative defense of waiver; and (3) the applicability of the MFL clause and finding of no breach as to certain claims. The Court takes up all of the cross-motions together.[2]

The district court first concluded that DTC breached the contract because the MFL is self-executing, and DTC failed to notify JPMC in accordance with the clause.[3] DTC does not assign as error either of these conclusions, so it has waived any argument on them. Thus, this appeal concerns only the amount of damages and DTC's affirmative defenses.

With respect to damages, the district court concluded, in an issue of first impression, that the broadly worded MFL clause in JPMC's lump-sum license agreement gave JPMC the right to incorporate the more favorable terms in the Cathay lump-sum license agreement because both licenses were for unlimited use but the Cathay license cost far less.[4] The court also concluded that the only way to give effect to the MFL clause was to apply the new terms retroactively

---

[2] *Id.* at 647-48 (citations and footnotes omitted).

[3] *Id.* at 649-51.

[4] *Id.* at 652-53.

and refund the amount of overpayment,[5] but first it had to determine the amount properly owed under the new terms.

The district court reasoned that in retroactively replacing the terms of the JPMC license with the more favorable terms of the Cathay license, it must also apply the Cathay license terms requiring an additional license payment of up to $250,000 for each after-acquired entity. Because the record did not show JPMC's acquisitions since 2005 or what use those entities, if any, made of the patents, the district court denied summary judgment and invited the parties to address the issue of damages later.[6] Finally, the district court rejected all of DTC's affirmative defenses, including the three at issue on appeal: statute of limitations, waiver, and estoppel.[7] Those three are discussed further below.

Thereafter, the parties filed an agreed stipulation on June 2, 2015, under which DTC stipulated that it "is unable to raise a genuine dispute as to any material fact controverting that the Court has found that JPMC is entitled to the $250,000 price term of the Cathay License." DTC also stipulated that it is unable to raise a genuine issue of material fact that, under the terms of the Cathay license, JPMC would owe an additional $250,000 for each of three entities it had acquired after 2005: Bank of New York, Washington Mutual, and Bear Stearns. Finally, DTC stipulated that "[i]n light of the foregoing, DataTreasury is unable to raise a genuine dispute as to any material fact controverting JPMC's claim of $69 million in damages and that JPMC is entitled to judgment as a matter of law regarding damages."

DTC's stipulations meant that, under the terms of the Cathay license, JPMC would owe $250,000 for the lump-sum unlimited-use license as well as $250,000 for each of the three entities it had acquired since 2005. Accordingly,

---

[5] *Id.* at 653.

[6] *Id.* at 654-55.

[7] *Id.* at 656-58.

No. 15-40905

the district court entered a final judgment the same date in favor of JPMC in the amount of $69 million (the $70 million JPMC paid under its original license less the $1 million total it owed under the retroactively applied terms of the Cathay license). DTC timely filed a notice of appeal.

## II.    Applicable Law

### A.    Jurisdiction and standard of review

The district court had jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332(a), and we have jurisdiction over this timely appeal of a final judgment pursuant to 28 U.S.C. § 1291.

We review the district court's judgment de novo, applying the same Rule 56 standards the district court applied.[8] We "review the district court's judgment on cross motions for summary judgment de novo, addressing each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party."[9]

### B.    Contract interpretation rules

The parties agree that Texas law applies to this dispute. The Fifth Circuit has summarized Texas's rules for contract interpretation as follows, citing opinions of the Texas Supreme Court:

> Our first task is to determine whether the contract is enforceable as written, without resort to parol evidence. The primary objective of the reviewing court is to ascertain the intentions of the parties as expressed in the contract. To achieve this objective, the court should examine the entire contract in order to "harmonize and give effect to all of its provisions so that none will be rendered meaningless." A contract is unambiguous if it can be given a definite or certain legal meaning. Ambiguity does not arise because of a "simple lack of clarity," or because the parties proffer different interpretations of the contract. Rather, a contract is ambiguous

---

[8] *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 348 (5th Cir. 2007).

[9] *Morgan v. Plano Ind. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009).

7

only if it is subject to two or more reasonable interpretations after applying the pertinent canons of construction. If the contract is ambiguous, courts may consider parol evidence for the purpose of ascertaining the parties' intent.[10]

The parol evidence rule is particularly important to this appeal because nearly all of DTC's arguments—and several of the dissent's points of contention—depend on parol evidence, not on the plain language of the MFL clause.

## C.    MFL clauses, royalties, and the licenses at issue

This dispute concerns an MFL clause, particularly DTC's primary contention that, as a matter of law, an MFL clause cannot be applied retroactively, i.e., to obtain a refund of amounts previously paid.

It is first necessary to distinguish among the different types of royalties available under a license, as the district court explained:

> "Rate" often designates a percentage of selling price, or a "running royalty." *See Rambus Inc. v. Hynix Semiconductor Inc.,* 2008 WL 2795135, at *4–6 (N.D. Cal. July 15, 2008). But a royalty rate simply "means the compensation paid by the licensee to the licensor for the use of the licensor's patented invention." *Hazeltine Corp. v. Zenith Radio Corp.,* 100 F.2d 10, 16 (7th Cir. 1938). Therefore, a lump-sum license also states a royalty rate, in the amount of the lump sum. *Cardinal of Adrian,* 208 U.S.P.Q. at 822–23; 2 Jay Dratler, *Licensing of Intellectual Property,* § 9.02[1] ("A 'royalty rate' may include the right to a fully paid-up license for a lump sum or a lump sum per unit time") (footnotes omitted). Thus, a lump-sum licensee pays a paid-up sum for unlimited use of the patent at the single price instead of a discrete amount for each successive use, as under a running royalty.[11]

The distinction between running royalties and paid-up lump-sum royalties is central to this case. It is certainly true that a licensee invoking an

---

[10] *McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*, 736 F.3d 375, 377-78 (5th Cir. 2013) (citations omitted).

[11] 79 F. Supp. 3d at 652.

MFL clause may not obtain a refund of amounts paid under a previously applicable *running* royalty, and there are a great number of cases applying that rule.[12] However, there is no reported case applying that rule when switching from a paid-up lump-sum license to a more favorable paid-up lump-sum license, as in this case. Even a cursory review of MFL clause commentary shows that the rule precluding refunds is not absolute:

> The risk that others will receive more favorable license terms is a substantial threat to any licensee that relies extensively on licensed rights in a competitive environment. As a result, many licenses contain provisions designed to ensure that this does not occur and to guarantee access by one licensee to more favorable terms granted to later licensees. Described as "most-favored" clauses, these contract provisions vary greatly and provide for any number of different conditions on which they are triggered and for a variety of different remedies in the event of a later, more favorable license, ranging from automatic adjustment of the original license to **refund of overages previously paid**.[13]

It is common for such a clause to "require the licensor to advise the licensee of any license on more favorable terms and grant the licensee the option to elect those terms."[14] Generally speaking,

> [a] patent licensee's breach of contract damages for a licensor's failure to provide information necessary for the licensee's exercise of a most-favored-licensee provision includes recovery of royalties

---

[12] *See, e.g.*, *Rothstein v. Atlanta Paper Co.*, 321 F.2d 90, 91–93, 96 (5th Cir. 1963); *Studiengesellschaft Kohle, M.B.H. v. Hercules, Inc.*, 105 F.3d 629, 632, 634 (Fed. Cir. 1997); *Harley C. Loney Co. v. Mills*, 205 F.2d 219, 219–21 (7th Cir. 1953); *Guggenheim v. Kirchhofer*, 66 F. 755, 758 (2d Cir. 1895); *Hockerson-Halberstadt, Inc. v. Saucony, Inc.*, No. 04-1558, 2005 WL 767887, at *2, *5–*6 (E.D. La. Mar. 30, 2005); *Epic Sys. Corp. v. Allcare Health Mgmt. Sys., Inc.*, No. 4:02-CV-161-A, 2002 WL 31051023, at *3–4, *6 (N.D. Tex. Sept. 11, 2002) (hereinafter *"Epic"*); *Cadillac Prods., Inc. v. TriEnda Corp.*, No. 98-75206, 2000 WL 1279163, at *1, *4 (E.D. Mich. Aug. 2, 2000).

[13] 2 Information Law § 11:104 (database updated November 2015) (emphasis added); *see also* John Gladstone Mills III *et al.*, 5 Pat. L. Fundamentals § 19:21 (2d ed.) ("The purpose of a most-favored licensee clause is to protect a licensee from a competitive disadvantage resulting from more favorable terms granted to another licensee.").

[14] Melvin F. Jager, Licensing Law Handbook § 10:14 (database updated September 2015).

No. 15-40905

that the licensee paid in ignorance of its rights as a result of the failure of the licensor to give notice that it had granted other licenses on more favorable terms.[15]

The licenses granted to JPMC and Cathay are identical in most respects. Both are paid-up lump-sum licenses granting unlimited use of the patent. That is to say, neither of the licenses involves periodic royalty payments covering discrete periods of time or per-transaction royalty payments; neither is subject to any cap on the number of transactions; and neither has language tying the lump-sum payment for the unlimited license to either the anticipated number of transactions or the asset size of the licensee.

Based on the plain language of the licenses, the only material differences in payment terms are as follows: (1) JPMC's lump-sum license cost $70 million, while Cathay's cost only $250,000; and (2) Cathay's license required it to pay up to $250,000 as an additional paid-up lump-sum license for each entity it later acquired. Although the $70 million owed under the JPMC license was paid in installments while the Cathay license was apparently made in a single payment, that difference is not material. As noted above, JPMC was required to pay the full amount, and its failure to make any payment "shall result in a termination of the licenses and rights granted to JPMC and its Subsidiaries in this Agreement" under the Settlement and Release Agreement between DTC and JPMC. Thus, the JPMC license was all-or-nothing with respect to both the payment owed and the right to use DTC's patents, just like the Cathay license.

---

[15] 69 C.J.S. Patents § 516 (footnotes omitted; citing *Epic*, 2002 WL 31051023).

No. 15-40905

## III.  Analysis

### A.    The MFL clause applies retroactively and permits refunds.

DTC primarily argues that the MFL clause cannot apply retroactively, only prospectively from the date the new terms are recognized, citing what it calls the forward-looking language of the MFL clause (e.g., "The MFN shall be applied…"). DTC claims that the clause allows JPMC to escape only future payments still owed under the license at the time the MFL clause is recognized.

DTC's argument is based on the MFL clause's silence regarding retroactivity, but that silence favors JPMC. The major problem with DTC's interpretation is that it would render the MFL clause effectively meaningless in this case and in other cases involving two otherwise paid-up lump-sum licenses, differing only in the total license cost. Under DTC's interpretation, once the first licensee had fully paid its license fee (even if it paid the full amount at the outset), it could receive no practical benefit from invoking the MFL clause.

JPMC made the final installment payment on its $70 million paid-up lump-sum license in 2012 prior to DTC granting Cathay an unlimited-use license for $250,000. Under DTC's interpretation of the MFL clause, refunds would be precluded. Thus, although the MFL clause would, by its plain terms, allow JPMC to apply the benefit of the terms of the Cathay license, the substitution of terms would mean nothing because JPMC could never get back its $69 million overpayment under the newly applicable terms. Indeed, under DTC's interpretation, if JPMC had simply made a single $70 million payment in 2005 rather than spreading that amount out over several years of installment payments, JPMC never would have been able to invoke the MFL clause to obtain a better price term.

11

No. 15-40905

As the dissent argues, DTC's prospective-only interpretation would not render the MFL clause *wholly* without meaning because it might still give JPMC some relief—the ability to skip future payments—if DTC entered into a more favorable license before JPMC finished paying. But DTC's interpretation finds no support in the plain language of the MFL clause or in the nature of JPMC's payment obligation. As we explained above, although the $70 million payment was broken into scheduled installments, it was treated as a single amount in every material way. JPMC's failure to make any payment would terminate the entire license; it was required to pay the full amount or lose any benefits thereunder. DTC's interpretation, then, arbitrarily treats as divisible the fundamentally indivisible $70 million payment for the paid-up lump-sum license. The $70 million was effectively an indivisible lump sum, and we must treat it as such.

We conclude DTC's interpretation reaches an unreasonable result. Thus, it does not satisfy Texas law for contract interpretation. The district court reached the same result for similar reasons:

> The most favored running royalty licensee initially holds the most favorable "rate" when it obtains its license. The initial rate becomes less favored when the licensor later grants a lower rate elsewhere. It is only then that the opportunity to use the patent at a more favorable rate develops (and the most favored licensee becomes disadvantaged). Thus, the damage to the most favored licensee with a running royalty can only occur prospectively. Accordingly, prospective-only modifications to a running royalty rate guarantee most favored licensee status in that situation.
>
> On the other hand, a lump-sum license is not metered by usage, because a lump sum license purchases unlimited use for a set price. When the patent holder grants a subsequent licensee a lower lump sum, the most favorable rate becomes the lower, lump-sum amount. However, the disadvantage imposed on the most favored licensee cannot be cured with a substituted running royalty rate going forward because there is no running royalty structure to the license. Therefore, the logic supporting a prospective-only

modification under a running royalty license is inapplicable to a lump-sum situation. There would be no purpose to a most favored licensee clause in a lump-sum license if the most favored licensee could not obtain a more favorable, later-granted lump-sum rate.

Here, in what appears to be an issue of first impression, the parties contemplated the MFL clause to apply where a lump-sum payment could be replaced by a more favorable lump-sum payment. Certainly, the MFL clause simply states, "If DTC grants to any other Person a license to any of the Licensed Patents, it will so notify JPMC, and JPMC will be entitled to the benefit of any and all more favorable terms with respect to such Licensed Patents." If JPMC were to be denied the ability to substitute a later-granted, more favorable payment term, it would render the MFL clause meaningless. The Court, however, must give meaning to the unambiguous terms of the contract. *Bituminous Cas. Corp. v. Maxey,* 110 S.W.3d 203, 208–09 (Tex.App.–Houston [1st Dist.] 2003, pet. denied) ("Terms in contracts are given their plain, ordinary and generally accepted meaning unless the contract itself shows that particular definitions are used to replace that meaning.").

Therefore, where a licensee with a most favored licensee clause seeks to replace what has become a less-favored lump-sum license payment with a later-granted, more favorable lump-sum payment, the only way to give meaning to the MFL clause is by retroactive substitution of the payment term. That is the outcome of the parties' contract here.[16]

Under Texas law, common sense, the plain language of the MFL clause, and the commentary quoted above, we conclude that the district court correctly held that the MFL clause requires the court to apply the MFL clause retroactively and grant a refund.

We also conclude that DTC has failed to cite any analogous contrary authority. For example, DTC cites *Davis v. Blige*, 505 F.3d 90, 104 (2d Cir. 2007), for the proposition that "[t]he prospective nature of licenses has long been recognized in the law of patents." What that sentence means in context is

---

[16] 79 F. Supp. 3d at 652-53 (citations omitted).

that securing a license covers *future* use of the patent; a license does not insulate the licensee from a suit for *past* infringement. That has no relevance to this dispute.

Even less persuasive is DTC's reliance on the district court's opinion in *Epic* for the proposition that "a licensee is not entitled to credit for royalty payments made prior to the making of an election" of a more favorable license term under an MFL clause.[17] DTC reads *Epic* too broadly; it is factually and legally inapposite to this dispute.

In *Epic*, the plaintiff-licensee, Epic, had a license to use the patent of the defendant-licensor, Allcare, which required annual running royalty payments as well as additional per-unit royalties for usage exceeding an annual threshold.[18] The license agreement included an MFL clause that allowed it to substitute more beneficial financial terms in any license between Allcare and a competitor of Epic. Epic learned that Allcare had granted a paid-up lump-sum license to a competitor for $350,000, and Epic formally invoked the MFL clause in October 2001.

At the time Epic formally invoked the clause, it had already paid $204,080 under its running royalty license and attempted simply to pay the difference between that amount and the $350,000 lump-sum license. Allcare rejected the offer, and Epic eventually sued. By the time the case came up for decision on summary judgment, Epic had paid Allcare a total of $538,295.88 in running royalties under its existing license, plus another $197,406.14 in an escrow account pending resolution of the dispute.

The district court concluded that the competitor's $350,000 paid-up lump-sum license was indeed more favorable, so Epic was entitled to switch

---

[17] *Epic*, 2002 WL 31051023, at *6.
[18] *See generally Epic*, 2002 WL 31051023.

over to that royalty scheme as of October 2001, when it formally invoked the MFL clause.[19] From that date forward, the district court deemed Epic's license to be a paid-up lump-sum license, and the amount paid thereafter no longer running royalties but amounts paid toward the paid-up lump-sum license amount. The court therefore applied the usual rule that Epic was not entitled to a refund of any running royalties it had made under its original license agreement, prior to formally invoking the MFL clause in October 2001.[20] Importantly, however, the court held that Epic *was* entitled to a refund of any royalties it paid in excess of $350,000 *after* it formally invoked the MFL clause in October 2001 and was deemed to be operating under a paid-up lump-sum license.[21]

As noted, DTC claims *Epic* stands for the proposition that a licensee may never get a refund of any royalties paid before an election under an MFL clause, but *Epic* is factually distinguishable and its holding not nearly so broad as DTC asserts. In *Epic*, the court held that Epic could not obtain a refund for the *running royalties* it had paid under its initial license. Notably, all of the cases cited in *Epic* for that proposition also involved the payment of *running royalties* under the initial license as well,[22] and we can find no cases permitting a refund of past-paid running royalties in any context. That point is neither

---

[19] *Id*. at *6.

[20] *Id*. (citing *Rothstein,* 321 F.2d at 96; *Harley C. Loney Co.,* 205 F.2d at 221; *Cadillac,* 2000 WL 1279163 at *4).

[21] *Id*.

[22] *See Rothstein,* 321 F.2d at 91-92 (3% running royalty under the initial license agreement); *Harley C. Loney Co.,* 205 F.2d at 219 (initial license "required defendant to pay a specified royalty upon each licensed wheel balancing weight sold by defendant"); and *Cadillac*, 2000 WL 1279163 at *1 (initial license required payment of "approximately $1.00 per unit"). The other cases DTC cites are all similarly distinguishable because none of them involves an MFL clause where both the original license and the more favorable license are paid-up lump-sum unlimited-use licenses.

new nor relevant, however, because JPMC never had a running royalty agreement, only a paid-up lump-sum license agreement.

More relevant here is the fact that the district court award Epic a refund of amounts paid in excess of $350,000 from the time it switched to a paid-up lump-sum license. The key point is that once Epic made its election, all of its payments were deemed to be made under a paid-up lump-sum license, not a running royalty license. If those payments had still been considered running royalties, they would have remained nonrefundable under the case law cited by the district court, but they were now considered payments on a paid-up lump-sum license. The only way to ensure that Epic obtained the benefit of its new paid-up lump-sum license was to refund the amount of the overpayment.

Neither the parties nor this court can find a single MFL clause case involving a switch from an initial paid-up lump-sum license to a later more favorable paid-up lump-sum license, as is present in this case. Even though the issue appears to be one of first impression in caselaw, it is actually simpler than most MFL clause cases. First, DTC has never cited any authority holding that amounts paid for a paid-up lump-sum license are nonrefundable, only cases stating that running royalties are nonrefundable. As noted, *Epic* plainly allowed the refund of amounts paid under the paid-up lump-sum license, which were not considered running royalties.

Second, two paid-up lump-sum licenses are much closer to an apples-to-apples comparison than a running royalty license and a paid-up lump-sum license (as in *Epic*) or two running royalty licenses with incommensurable terms. The biggest material difference between two paid-up lump-sum licenses is the total cost. An MFL clause would mean virtually nothing if it did not allow the earlier licensee to obtain a lower license cost, which in turn means nothing if the earlier licensee cannot receive a refund in the amount of the overpayment.

In sum, DTC's interpretation leads to an unreasonable result, and it has not cited any apposite legal authority in support of that interpretation. The district court correctly held that the MFL clause may be applied retroactively and that JPMC is entitled to a refund for the amount it overpaid under the retroactive terms of the Cathay license, i.e., $69 million.

**B.    The MFL clause does not permit an analysis of different licenses based on check volume.**

Next, DTC argues that the district court erred by not considering the different levels of usage by JPMC and Cathay. DTC claims the MFL clause ties the total cost of the JPMC license to a per-transaction royalty estimate, based on the second sentence of the MFL clause: "JPMC agrees that $.02 to $.05 per Transaction is a reasonable royalty under the license granted herein, and JPMC makes no representation as to what pro-rata share of such royalty is attributable to any portion or sub-part of such Transaction."[23] That argument has no merit.

The plain language of the MFL clause does not support DTC's interpretation because it does not, on its face, contain any language limiting the MFL clause. The district court reasoned that the second sentence is essentially disconnected:

> the second sentence of the MFL clause unambiguously provides JPMC's representation of a reasonable royalty rate in exchange for inclusion of the MFL clause. *See Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 312 (Tex. 2005) (encouraging courts to consider the business purpose a contract serves). The second sentence has no bearing here and neither party has argued otherwise.[24]

---

[23] 79 F. Supp. 3d at 647.
[24] *Id.* at 649.

17

No. 15-40905

DTC *does* assert on appeal that the second sentence limits application of the MFL clause by creating a per-transaction rate, but it has no support for that point. First, there is no question that the license at issue is a paid-up lump-sum license which allows unlimited use. It does not include a per-transaction royalty. As other courts have explained, "there is no basis in fact for the conversion of a lump sum rate of royalty into a rate of per cent of selling price royalty,"[25] or vice versa.[26] The two types of royalties are fully distinct; "[t]he former is a true alternative to the latter and must be so treated in determining the rights of [the parties] in respect to royalty provisions."[27]

Second, even if there were a factual basis for calculating the effective running royalty rate of the lump-sum royalty at issue here, it would be far from two to five cents per transaction. DTC claims JPMC processes approximately five billion check images each year. At two cents per transaction, JPMC's running royalty would amount to approximately $100 million *per year*. Considering JPMC entered into the license agreement in 2005, the total amount JPMC would have paid by 2012 under a per-transaction royalty agreement presumably would have exceeded $1 billion even at two cents per transaction, more than an order of magnitude greater than what it paid for the lump-sum license permitting unlimited use.

If anything, the presence of the "$.02 to $.05 per Transaction" clause undermines DTC's position. It indicates that the parties expected the MFL to apply to pricing terms in future licenses; if they thought about the possibility that some contracts could employ a running royalty method of payment, presumably they also anticipated the possibility that future contracts could use a lump-sum-payment method, as their contract in fact did. It is not entirely

---

[25] *Hazeltine*, 100 F.2d at 18.

[26] *Studiengesellschaft*, 704 F.2d at 57 (citing *Cardinal of Adrian*, 208 U.S.P.Q. 822).

[27] *Hazeltine*, 100 F.2d at 18.

evident why the individual parties agreed to include the "$.02 to $.05 per Transaction" clause. JPMC contends it was designed to benefit DTC in other litigation, which DTC strongly disputes. Nevertheless, given the difficulties inherent in comparing lump-sum payments to running royalties, the purpose likely was to set a rate that JPMC would consider reasonable (i.e. not more favorable) in any running royalty contracts that DTC made. Obviously, the agreement already provided a point of comparison for lump-sum agreements—the $70 million fee.

Third and finally, there is no language in any relevant document (the settlement agreements, the JPMC license, or the Cathay license) explaining how the parties arrived at the lump-sum amounts paid by either JPMC or Cathay. Given that the contractual language is clear and unambiguous and supports only JPMC's interpretation, Texas law precludes parol evidence such as the relative asset sizes and check volumes of JPMC and Cathay.

This result is required by the plain language of the contract, but it could have been avoided with more careful drafting by DTC, as the district court explained:

> Having considered these problematic issues, the Court notes that Professor Dratler discusses ways to improve an MFL clause:
>
>> Case law suggests two ways to improve the standard, broadly-drafted clause. The first is to **make specific provision for situations that experience has shown are most likely to cause difficulties**. The most common of these are infringement settlement licenses, cross-licenses, and **lump-sum licenses** and volume or production limits. . . .
>>
>> A second means of reducing the risk of most-favored-licensee clause from the licensor's standpoint is to require the favored licensee to accept *all* the terms of any later license, good and bad, as a condition of receiving the benefit of any more favorable terms. Although the law generally requires this in any event,

No. 15-40905

**explicit contractual language to that effect** may avoid unnecessary litigation.

2 Jay Dratler, *Licensing of Intellectual Property,* § 9.05[1]–[2] (2014) (footnotes omitted, bolded emphasis added); *cf.,* Federal Judicial Center, *Manual for Complex Litigation, Fourth,* at § 13.23 (2004), which states:

> [MFL] clauses have several drawbacks]: (1) the potential liability under them is indeterminate, making them risky; (2) the additional recovery they may produce for some plaintiffs without any effort by their attorneys makes it difficult to fix fees; and (3) the factors that induce parties to settle with different parties for different amounts, such as the time of settlement and the relative strength of claims, are nullified. Such clauses can provide an incentive for early settlement as well as an obstacle to later settlements. To limit their prejudicial impact, such clauses should terminate after a specified length of time (to prevent one or more holdouts from delaying final implementation), impose ceilings on payments, and allow flexibility to deal with changed circumstances or with parties financially unable to contribute proportionately. The judge may have to consider voiding or limiting them if enforcement becomes inequitable. If this determination involves disputed questions of fact, an evidentiary hearing and possibly additional discovery may be necessary.

(Footnotes omitted.) Here, the MFL clause was sparsely defined, very broadly worded, contained no specific limitations or provisions for difficult situations, included no language of termination, and appears not to have contemplated the effect of a later license agreement, *particularly* one based on a lump-sum payment of the type at issue here. The impact of a less than well-defined MFL clause is clearly seen in this litigation.[28]

We fully agree. The potential problems with a broadly worded and open-ended MFL clause (most of which affect the licensor), are fairly obvious, and

---

[28] 79 F. Supp. 3d at 655-56 (emphasis and most omissions in original).

the means of avoiding potential problems as experienced above are simple. DTC failed to include any such restriction, such as limiting the effective period of JPMC's right under the MFL clause, capping the total volume of check-clearing transactions under the Cathay license, tying the amount paid for the paid-up lump-sum licenses to the licensee's asset size in either license, or stating that the amount paid was tied to the remaining life of the patent. Any or all of those restrictions could have been reasonable, as DTC argues, but the MFL clause contains none of them. Because the language of the MFL clause is clear and unambiguous, we must apply it as written. DTC may not introduce parol evidence, including the relative check volumes and asset sizes of JPMC and Cathay, to change the plain language.

## C.    DTC's affirmative defenses are not viable.

DTC asserts three affirmative defenses, none of which is viable. First, DTC asserts that JPMC's lawsuit is barred by the four-year statute of limitations, despite the fact that JPMC brought it less than two months after DTC entered into the Cathay license, as the district court noted.[29] DTC seems to be arguing that the MFL clause gave JPMC a single right to enforce, no matter how many times DTC breached. DTC points out that it first breached the MFL clause more than four years ago when it entered into its first license with a third party on more favorable terms than with JPMC. Thus, under DTC's interpretation, JPMC has completely lost the right to sue for breach of the MFL clause due to the statute of limitations. DTC has failed to cite a single case supporting its very broad interpretation of the statute of limitations, and we can find none. There is no merit to this argument. Moreover, DTC never even provided sufficient notice of its earlier breaches as required by the MFL clause.

---

[29] *Id.* at 658.

Second, DTC argues that JPMC waived its right to enforce the MFL clause by making the final installment payment under the $70 million lump-sum license without reserving any rights after it suspected DTC had breached. JPMC made the final installment payment months before DTC executed the Cathay license, and DTC points to no evidence that JPMC waived the Cathay breach. All of DTC's evidence of alleged waiver dates from prior to execution of the Cathay license, as the district court explained in full.[30] Because DTC has failed to present any evidence that JPMC waived its rights under the MFL clause with respect to the Cathay breach, we conclude there is no merit to DTC's waiver defense.

Third and finally, DTC asserts the defense of equitable estoppel, which is virtually a restatement of its other two defenses. DTC argues that JPMC should be estopped from asserting the breach of contract claim against DTC because JPMC made the final payment required under the contract without informing DTC of its intent to sue and without reserving any rights. As the district court pointed out, "DTC cites no authority, nor is the Court aware of any, that JPMC can be estopped from a breach of contract claim just because it satisfied its contractual obligations."[31] That remains true.

Even if DTC could assert equitable estoppel, it has failed to prove the necessary element that it "detrimentally relie[d] on the representation."[32] DTC claims it detrimentally relied on JPMC's silence regarding its intent to sue when it used JPMC's final payment to pay its ordinary operating expenses. The district court explained that DTC cannot rely on that fact because DTC's President and CEO testified that DTC would have paid its operating expenses

---

[30] *Id*. at 656-57.

[31] *Id*. at 657.

[32] *Id*. (citing *Trudy's Texas Star, Inc. v. City of Austin,* 307 S.W.3d 894, 906 (Tex. App. 2010)).

No. 15-40905

even if JPMC had paid subject to a reservation of rights.[33] On appeal, DTC does not dispute that fact. Because DTC cannot prove a necessary element of its equitable estoppel defense, that defense fails as a matter of law.

## IV.    Conclusion

We affirm the district court's final judgment for the reasons set out above and for the reasons set out in the district court's careful memorandum opinion and order.

AFFIRMED.

---

[33] 79 F. Supp. 3d at 657-58.

No. 15-40905

STEPHEN A. HIGGINSON, Circuit Judge, concurring in part and dissenting in part:

Texas contract law directs courts to "ascertain and give effect to the parties' intentions as expressed in" the contract at issue, "bearing in mind the particular business activity sought to be served" and "avoid[ing] when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 311–12 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). And "[w]hether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). Applying these principles, I respectfully disagree with the majority opinion's interpretation of the following clause:

> If DTC grants to any other Person a license to any of the Licensed Patents, it will so notify JPMC, and *JPMC will be entitled to the benefit of* any and all more favorable terms with respect to such Licensed Patents. JPMC agrees that $.02 to $.05 per Transaction is a reasonable royalty under the license granted herein. The MFL *shall be applied within thirty (30) days* from the date this provision is recognized . . . .

In light of the prospective language of the MFL clause, case law interpreting similar language, and the implausibility that the parties would have agreed to MFL language that functions as JPMC argues, I would hold—consistently with every other court to have interpreted a similar clause—that JPMC is not entitled to recoup sums paid *before* DTC granted any lower-priced license.

We have addressed a similarly worded clause before and reached a conclusion opposite to that which the majority reaches today—indeed, at oral argument, JPMC conceded that the reasoning behind the only Fifth Circuit authority in this area was "troubling" for its position. In *Rothstein v. Atlanta*

24

*Paper Co.*, Rothstein licensed its bottle-carrier patent to Atlanta in exchange for a three-percent royalty on Atlanta's sales. 321 F.2d 90, 91–92 (5th Cir. 1963). The license agreement included this MFL clause:

> Atlanta shall be entitled to be in as favorable a position as any other manufacturer or seller of bottle carriers, wherefore any more favorable terms of conditions as to royalties that have been or hereafter may be granted to others who are licensed under said patent automatically shall become available to Atlanta . . . .

*Id.* at 92. About three years later, Atlanta asked about the terms of a settlement involving the same patent and learned that Rothstein had granted a competitor a paid-up license for $8,000. Atlanta "claimed [the right to] identical treatment with the result that it would be refunded all sums theretofore paid as royalty over and above $8,000." *Id.* at 93. This court held that Atlanta was entitled to a prospective license for $8,000, with credit for sums paid *after* the second license was granted, but rejected the argument that Atlanta could recover all royalties it paid in excess of $8,000 since the beginning of its own license, including *before* the second license was granted. *Id.* at 96. We held that "[t]he only reasonable construction" of the MFL clause was that it did "not operate retrospectively." *Id.* We also suggested that the evident purpose of the clause—preventing Atlanta from being at a "competitive disadvantage"—was consistent with prospective application because "there was a built-in gap until others were licensed." *Id.*

Citing *Rothstein*, a district court applying Texas law recently reached the same conclusion analyzing a similar MFL clause that read in relevant part:

> If after the Effective Date, Licensor shall enter into a License Agreement with any third party in the same Field of Use as Licensee . . . on financial terms that are more favorable to such Third Party Licensee than the financial terms set forth in this Agreement, Licensee shall be entitled to substitute the financial terms of such Third Party License for the counterpart or equivalent terms herein . . . .

No. 15-40905

*Epic Sys. Corp. v. Allcare Health Mgmt. Sys., Inc.*, No. 4:02-CV-161-A, 2002 WL 31051023, at *3 (N.D. Tex. Sept. 11, 2002). Although the MFL clause in *Epic*—like the one in *Rothstein*—did not expressly preclude retroactive application, the court concluded that the most-favored licensee "[was] not entitled to credit for royalty payments made prior to the making of an election" of more favorable terms. *Id.* at *6; *see also*, *e.g.*, *Harley C. Loney Co. v. Mills*, 205 F.2d 219, 219–21 (7th Cir. 1953); *Univ. Oil Prods. Co. v. Vickers Petroleum Co. of Del.*, 19 A.2d 727, 729 (Del. Super. Ct. 1941).

The majority justifies a different result here, reasoning that because JPMC did not pay a running royalty rate, applying a later-granted license's price term retroactively to the beginning of JPMC's license is necessary to avoid making the MFL clause "effectively meaningless." As a corollary, the majority deems inapposite the many cases holding that a most-favored licensee cannot recoup payments made before the subsequent license was granted. I perceive two problems.

## I.

First, whatever the case might be with a different license granted in exchange for a single lump-sum payment, *this* MFL clause would not be "meaningless" if it only applied prospectively. Unlike some MFL clauses that are limited to price terms, this one entitled JPMC to "the benefit of any and all more favorable terms" in any subsequent license. *See* 1 Alan S. Gutterman, GOING GLOBAL § 13:66 (2015) (noting that "the scope of [an] MFL clause usually extends to all other material conditions," not just the royalty rate); *cf. Epic*, 2002 WL 31051023, at *3 (referring only to "financial terms"); *Cameron Int'l Corp. v. Vetco Gray Inc.*, No. 14-07-00656-CV, 2009 WL 838177, at *1 (Tex. App. Mar. 31, 2009) (referring only to "royalty terms"). The eleven-page license agreement, which also incorporates a settlement and release agreement between the parties, contains nonprice provisions that could have been drafted

26

more favorably to JPMC.  But even taking the position that the MFL clause here concerns only price, reading the clause as meaningless requires eliding not only the MFL clause's prospective language, but also the contract's actual consideration terms.  Notably, the majority argues that DTC's interpretation is unreasonable because "*if* JPMC had simply made a single $70 million payment in 2005 rather than spreading that amount out over several years of installment payments, JPMC never would have been able to invoke the MFL clause to obtain a better price term."  But in fact—and unlike with Cathay's license, which the majority claims is materially identical except for the dollar amounts involved—most of JPMC's consideration was to be paid in annual installments, the last due seven years *after* JPMC's license began.  And if any of the subject patents was found invalid during that seven-year period, JPMC would have been excused from its remaining payments—a benefit not available to other DTC licensees such as Cathay that negotiated one-time lump-sum payments.

Because of this payment structure, which is evident from the face of the contract, applying this MFL clause prospectively (as has every other court to consider an MFL clause) would entitle JPMC to substantial cost benefits based on any licenses granted in the first seven years of the parties' agreement.  As explained more fully below, under this reading, the "benefit of" more favorable price terms to which JPMC "will be entitled" is the same benefit that a later lump-sum licensee gets upon conferral of its license: the right to unlimited use of the subject patents from that point until those patents expire, in exchange for a certain price.  *See Benefit*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The advantage or privilege something gives; the helpful or useful effect something has").  Especially given that another provision of the parties' agreement (the invalidity clause mentioned above) protected JPMC against future payments only during this seven-year period, I would hold that DTC's reading of the MFL

clause is reasonable, and the clause ambiguous. *See Columbia Gas*, 940 S.W.2d at 589 (explaining that contract language is ambiguous if it is "subject to two or more reasonable interpretations" and that the question of ambiguity "must be decided by examining the contract as a whole").[1]

Reading the MFL clause's language in the context of the rest of the contract thus shows that DTC's interpretation is reasonable. And though consideration of parol evidence would not be permitted if the contract at issue were facially susceptible to only one reasonable meaning, *see id.*, post-contracting events in this case are illustrative. In January 2006, DTC granted NCR Corporation a license for $2.85 million. At that point, JPMC had $40 million in scheduled payments remaining. If the parties had then applied the MFL clause, JPMC instead would have been entitled to a license going forward for $2.85 million in additional payments—saving the bank over $37 million. The clause, interpreted prospectively, would have provided similar price protection based on dozens of other licenses DTC granted before JPMC made its final payment on May 22, 2012. That hardly seems meaningless.

## II.

Second, in its attempt to give meaning to the MFL clause, the majority renders effectively meaningless the contract's consideration terms. It is undisputed that, at the time JPMC obtained its nonexclusive license, DTC planned to grant other licenses. A press release announcing JPMC's settlement and license—issuance of which was a term of the parties' agreement—mentioned other pending lawsuits involving the same patents and warned that "a complaint for infringing DTC's patents should be interpreted

---

[1] To the extent JPMC made payments in excess of a more favorable license after it was granted, it would be entitled to recover those overages. *See Epic*, 2002 WL 31051023, at *6. For that reason, the majority's citation of a commentator's statement that MFL clauses can lead to "refunds" is no answer to the argument that this MFL clause was not intended to *operate retroactively*.

as a formal invitation to either license or litigate." Over the course of the next eight years, DTC granted almost fifty other licenses covering the same patents, one for just $39,500. Only one of these subsequent licenses cost half as much as JPMC's, and over a dozen cost less than $100,000. It strains credulity that, given this business plan, DTC negotiated such a sizable and carefully structured payment plan with JPMC, the bulk of which would amount to nothing more than a loan—to be repaid within thirty days—as soon as DTC granted a less expensive license, no matter that the subsequent license covered a shorter time span of use.

In this regard, it is important to remember what DTC was selling: the right to use certain technology during the *finite* terms of its patents. It appears that the two patents named in JPMC's license agreement are set to expire in June 2016 and March 2017, respectively. *See* U.S. Patent. No. 5,910,988; U.S. Patent No. 6,032,137. JPMC, which acquired a license in June 2005, bought the right to use that technology for more than seven years longer than did Cathay, which acquired its license in October 2012.[2] As the majority opinion states, "[t]he purpose of a most-favored-licensee clause is to protect a licensee from a competitive disadvantage resulting from more-favorable terms granted to another licensee." *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 13 (2d Cir. 1997). I cannot discern how the grant of Cathay's license in 2012 placed JPMC at a competitive disadvantage during the previous seven years—a period during which JPMC's use of the licensed technology appears to have been substantial, as by 2013, JPMC was processing over five billion check images per year. Moreover, under JPMC's interpretation, the MFL clause would require the same $69 million refund if

---

[2] Even if JPMC's dond Cathay's licenses are extended—which JPMC suggests is possible, but does not contend actually has happened or will happen—JPMC will still have gotten over seven more years of licensed use of the technology than Cathay.

DTC had granted Cathay its license just a month before the licensed patents expired.

## III.

The majority opinion endorses JPMC's theory that the MFL clause in this manifestly nonexclusive license agreement unambiguously gave JPMC the right to pay nothing for its use of the subject patents during the period between the grant of its license and DTC's last grant of a lower-priced license, however many years later that might come.  Put differently, JPMC's theory is that this MFL clause gave it the right to pay the same amount for a much longer (and thus much more valuable) license.  This interpretation, at odds with the clause's prospective language and our case law interpreting a similar clause, strongly discourages licensing, especially to small competitors, as a licensor that had granted one non-running-royalty license with an MFL clause stands to lose significant money by granting a cheaper license to a smaller entity, even several years later.

No contractual text requires, and no prior case even suggests, this result, which could not have been the parties' mutual intention at the time of contracting.  Further, a reasonable alternative construction exists: that the MFL clause gave JPMC the benefit of more favorable nonprice terms for the duration of its license, and—like the clause excusing the bank from further payments after a final judgment of patent invalidity—protected JPMC with regard to more favorable price terms during the seven years over which it made payments.  Accordingly, I would reverse the district court's holding that the MFL clause unambiguously entitled JPMC to a refund of nearly all payments it made since the beginning of its license.[3]

---

[3] I concur in parts III.B and III.C of the majority opinion.