In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 20-1394

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MARJORY DINGWALL,

*Defendant-Appellant*.

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:19-cr-00023-jdp-1 — **James D. Peterson**, *Chief Judge*.

———————————

ARGUED APRIL 2, 2021 — DECIDED JULY 30, 2021

———————————

Before WOOD, HAMILTON, and KIRSCH, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Marjory Dingwall was charged with three counts of robbery and three counts of brandishing a firearm during a crime of violence. She admits the robberies but claims she committed them under duress, in fear of brutal violence at the hands of her abusive boyfriend, Aaron Stanley. Dingwall filed a motion in limine seeking a ruling on evidence to support her duress defense, including expert evidence on battering and its effects.

The duress defense has two elements: reasonable fear of imminent death or serious injury, and the absence of reasonable, legal alternatives to committing the crime. *United States v. Sawyer*, 558 F.3d 705, 711 (7th Cir. 2009). The district court denied Dingwall's motion, finding that her evidence could not meet either requirement. Dingwall then pleaded guilty to three counts of Hobbs Act robbery and one count of brandishing a firearm during and in relation to a crime of violence, but she reserved her right to appeal the decision on the motion in limine.

We see the question differently than the district court did, but we recognize that the rare cases like this are close and difficult, often dividing appellate panels. Dingwall surely faces challenges in demonstrating both imminence and no reasonable alternatives: Stanley was not physically present for any of the robberies, Dingwall actually held a gun, and there is a dispute about whether Stanley threatened harm if she did not commit these *specific* offenses. Those facts present questions for a jury, however. We join the Ninth, District of Columbia, and Sixth Circuits in concluding that immediate physical presence of the threat is not always essential to a duress defense and that expert evidence of battering and its effects may be permitted to support a duress defense because it may inform the jury how an objectively reasonable person under the defendant's circumstances might behave. See *United States v. Lopez*, 913 F.3d 807 (9th Cir. 2019); *United States v. Nwoye (Nwoye II)*, 824 F.3d 1129 (D.C. Cir. 2016) (Kavanaugh, J.); *Dando v. Yukins*, 461 F.3d 791 (6th Cir. 2006); contra, *United States v. Dixon*, 901 F.3d 1170, 1173 (10th Cir. 2018) (affirming exclusion of evidence of battered woman's syndrome); *United States v. Willis*, 38 F.3d 170, 173 (5th Cir. 1994) (same). We

therefore reverse the judgment of the district court and re-mand for further proceedings.

I.  *Nature and Elements of a Duress Defense*

The defense of duress "may excuse conduct that would otherwise be punishable." *Dixon v. United States*, 548 U.S. 1, 6 (2006). This is "because the defendant nevertheless acted un-der a threat of greater immediate harm that could only be avoided by committing the crime charged." *Sawyer*, 558 F.3d at 711.

To present a duress defense, the defendant must produce evidence that "(1) she reasonably feared immediate death or serious bodily harm unless she committed the offense; and (2) there was no reasonable opportunity to refuse to commit the offense and avoid the threatened injury." *Id.*, citing *United States v. Jocic*, 207 F.3d 889, 892 (7th Cir. 2000). "To satisfy a threshold showing of a duress defense, a defendant must in-troduce sufficient evidence as to all the elements of the de-fense." *United States v. Tanner*, 941 F.2d 574, 588 (7th Cir. 1991) (citations omitted); see also *Dixon*, 548 U.S. at 17 (defendant must establish duress defense by preponderance of evi-dence).[1]

---

[1] Modern courts, including this one, sometimes use the terms "du-ress" and "necessity" interchangeably. E.g., *United States v. Tokash*, 282 F.3d 962, 969 (7th Cir. 2002) ("We have repeatedly and unquestioningly held that a defendant claiming a defense of *necessity or duress* must estab-lish that he was under imminent fear of death or serious bodily harm.") (emphasis added). But the Supreme Court has recognized the common law distinction between the two:

> Duress was said to excuse criminal conduct where the ac-tor was under an unlawful threat of imminent death or serious bodily injury, which threat caused the actor to

The duress defense uses "reasonable" twice, first in terms of the defendant's reasonable fear of harm, and second in terms of whether a reasonable and legal alternative course was available. The Model Penal Code puts it a little differently but still makes reasonableness the touchstone: "It is an affirmative defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or threat to use, unlawful force against his person or the person of another, that a *person of reasonable firmness in his situation* would have been unable to resist." Model Penal Code § 2:09(1) (1985) (emphasis added), quoted in *Lopez*, 913 F.3d at 822. "Reasonableness is the touchstone of a duress defense… . Whether an alternative is reasonable turns on whether a reasonable person would have availed herself of it." *Nwoye II*, 824

> engage in conduct violating the literal terms of the criminal law. While the defense of duress covered the situation where the coercion had its source in the actions of other human beings, the defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils.

*United States v. Bailey*, 444 U.S. 394, 409–10 (1980); see also *United States v. Garza*, 664 F.2d 135, 140 n.7 (7th Cir. 1981) (discussing *Bailey* and concluding that appellants were asserting defense of duress since they feared harm from others).

The Seventh Circuit Pattern Criminal Jury Instructions describe "coercion/duress" as when the defendant has proven that she committed the offense "because [she was] coerced"; and "[t]o establish that [she] was coerced, [the] defendant must prove" fear of immediate death or serious injury if she did not commit the offense, and had no reasonable opportunity to refuse to commit the offense. Seventh Circuit Pattern Crim. Jury Instr. § 6.08 (2020 ed.). We use "duress" because the term seems more prevalent in this circuit under similar circumstances.

F.3d at 1136–37. As we explain below, expert evidence on bat-
tering and its effects may give a lay jury useful insights about
the situation in which a person of reasonable firmness finds
herself.[2]

II. *Factual and Procedural History*

   A. *Facts of Abuse and the Robberies*

Because we review what amounts to a rejection of
Dingwall's duress defense as legally insufficient, we accept
her version of the facts for purposes of this appeal. We draw
much of our account from the statement, text messages, pho-
tographs, and other evidence she submitted to support her
motion in limine. Marjory Dingwall met Aaron Stanley in
Madison, Wisconsin while she was in treatment for alcohol
abuse. Stanley, out of recovery himself, was a volunteer van
driver at the treatment center. The two began a relationship.
After Dingwall relapsed, she was barred from the treatment
center.[3]

---

[2] We use the phrase "battering and its effects" because it is more in-
clusive and less prone to stereo-typing of victims than the older phrase,
"battered woman syndrome," which was often used as courts took a new
look at domestic violence in the 1970s and 1980s, and which continues to
be used in many courts. See *Nwoye II*, 824 F.3d at 1133 n.1.

[3] There are many reasons why medical professionals discourage da-
ting during the first year of recovery, but one is particularly disturbing:
"the practice in which elder members with more years of sobriety sexually
pursue newcomers" is so common that it is called "13th stepping." Eliza-
beth Brown, *The Culture of Alcoholics Anonymous Perpetuates Sexual Abuse*,
VICE (Nov. 10, 2017, 4:57 P.M.), https://www.vice.com/en/arti-
cle/7x4m8q/sexual-assault-alcoholics-anonymous (last visited July 30,
2021).

Dingwall and her daughter lived in a rented room for a few weeks but moved out after she woke up one night to find the landlord sitting on her bed. They next stayed at a homeless shelter, but some nights the shelter had no space and they had to sleep on the floor of a friend's home. Stanley asked Dingwall to stay with him, but that lasted only a week because Dingwall became concerned by the way Stanley was treating her. But after another week back at the homeless shelter, Dingwall and her daughter again moved in with Stanley.

Stanley then began using crack cocaine. Slowly he became emotionally and then physically abusive to Dingwall. Stanley's beatings escalated from hitting and strangling, to dragging Dingwall down the stairs, breaking her nose, and boxing her ear. Soon a pattern became apparent: Stanley would beat Dingwall, then apologize profusely, and things would then return to "normal" for a while until Stanley would fly into a rage again.

After Stanley bought a gun, the beatings and controlling behavior got worse. One night, Stanley shot the gun into the mattress on the side where Dingwall slept. Stanley began walking around the house, holding the gun. He frequently looked through Dingwall's phone, certain that she was cheating on him. He took her food-stamp card, making it difficult for Dingwall to buy food. Dingwall wanted to leave, but she felt that she had no other options.

Stanley began robbing stores to get money for drugs. When he felt that he was "hot" and had run out of money, he started telling Dingwall that she owed him money. After unsuccessfully begging her parents for money, Dingwall stalled by lying to Stanley, insisting that there were problems with

routing the money from her parents. After a few days of delay, Stanley grew frustrated and literally pistol-whipped her.

The next day, on January 6, 2019, Stanley drove Dingwall to a Stop-N-Go gas station near Madison. He told Dingwall to put on a sweatshirt backwards, said it was her "turn," and put his gun in her hand. Dingwall walked in, showed the clerk she had a gun, "asked" for money, took approximately $80 cash from the clerk, and ran out.

Stanley did not hit her that night, sending the message that committing the crime as ordered was a way to avoid his abuse. But the money did not protect Dingwall for long. Stanley harangued her the entire next day, reminding her that she still owed him money, telling her "NEED THE REST OF THE MONEY THIS IS BS," and more.[4] Dingwall committed the second robbery while Stanley was still at work: she took the gun to a boutique store, pointed it at the clerk on the counter, and demanded money. Dingwall did not tell Stanley that she got the money from a robbery; she told him it was from her mother. That night, Stanley was "nice to [her]" but demanded degrading sex.

On January 8, 2019, Stanley called Dingwall from work, yelling and demanding the rest of the money. He told Dingwall that Mobil would be a good gas station to "hit." That afternoon, Dingwall entered a Mobil gas station, revealed her pistol grip, demanded money, and left after the clerk complied.

---

[4] Texts include: "hope it all goes well can u plz lmk asap when u get ur money!!!!"; "U and ur mother need 2 figure this S*** OUT."; "I see NO reason ur mom can't deposit this f***ing money."; "Unless ur lying." SA141–42. Dingwall responded, "Just F***in Kill me already." SA143.

The next morning, Stanley strangled Dingwall and punched her in the face. Dingwall later texted Stanley asking him to "please try to be nice to me. I'm so sore from this morning," and "I've never been hit so hard in all my life." Police arrested Dingwall a few days later.

B. *Procedural History*

A federal grand jury charged Dingwall with three counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and three counts of brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).

Dingwall filed a pretrial motion in limine seeking a ruling on evidence she planned to offer about battering and its effects to support a duress defense. The evidence included the statement by Dingwall, emails, text messages, and an expert report from Dr. Darald Hanusa, Ph.D., LSAC, of the Midwest Domestic Violence Resource Center. Dr. Hanusa spent a full day with Dingwall, evaluating her mental state through over a dozen standardized measures applying questionnaires and checklists. He diagnosed Dingwall with Post-Traumatic Stress Disorder (PTSD) and Battered Woman Syndrome (as defined in the DSM-5, 309.81 (2013)) as a victim of what he described as "an extraordinarily extreme case of relationship abuse." SA34–35.

Dr. Hanusa's report summarized social science research showing that battering can transform a victim's cognition and perception, including through: loss of an assumption of safety, loss of a view of the world as meaningful, holding negative beliefs about self, development of a "continuum of tolerance" (meaning increased tolerance for abuse from the

partner and rationalization of such abuse), and increased tolerance for "cognitive inconsistency" as a means of adjusting to the partner's unpredictable conduct. SA36–37.

In his conclusions, Dr. Hanusa explained that battered women "are typically fearful and off balance. Their attempts to decrease, minimize and stop the violence can include cajoling the abuser, engaging in self-destructive [behaviors] including self-blame, criminal or illegal behaviors or any other way that they can." SA51. Dr. Hanusa continued:

> As with victims of terrorism or those held hostage, a battered woman's perception of her situation and reality in general is changed and substantially altered. When this occurs, *her capacity to evaluate options is diminished substantially*. As a mechanism related to "learned helplessness[,]" *she will take whatever action that has the highest predictability stopping the violence against her*, even if — in the long run — it is detrimental to her own wellbeing. As Marjory shared in this report, the only thing that would predictably stop Aaron's abuse of her was to do exactly what he said, even committing robbery.
>
> … [B]attered women, such as Marjory, have experienced trauma and consequently have had their basic beliefs about the world and themselves challenged and changed. These changes have a great impact on a battered woman's perceptions of her options, on not just the relationships she forms, and choices she makes in her life but the consequences of these choices and

her desire to avoid further violence from her partner.

… According to Dutton (1993), the battered woman's *perception of viable options for stopping the violence and abuse by any means* is not only shaped by her own prior experience with violence, but also influences her future actions in response to violence. The perception or understanding of whether there are options available that would end the violence is based largely on what has actually been learned through experience.

SA51–52 (emphases added).

Dr. Hanusa concluded that Dingwall "was at extreme risk for being killed in this relationship." SA55. He summed up his views on the duress defense:

Marjory has survived a relationship in which her physical and emotional character was subjected to horrific abuse [in her] physical and psychological relationship with Aaron. Based on the data presented in this case, it is reasonable to conclude that Marjory was not in a position to question Aaron's demands to commit robbery let alone act against them, even though she knew that these activities were illegal.

SA 54. The district judge studied Dingwall's proffer carefully but concluded that it was not sufficient under existing circuit precedent, reasoning that even if Dingwall's evidence were credited, the duress requirements of imminence and of no legal alternatives could not be satisfied. The judge denied

Dingwall's motion in an oral ruling, observing the absence of circuit precedent on the issue and looking "forward to seeing what the Seventh Circuit says about it."

Dingwall then entered conditional pleas under Federal Rule of Criminal Procedure 11(a)(2), pleading guilty to three counts of Hobbs Act robbery and one of the § 924(c) firearm counts, but reserving her right to appeal the denial of her motion in limine. At the sentencing hearing, the district court asked this court to reverse its legal position on the duress defense: "I hope that the Seventh Circuit joins the other circuits and says, 'Look, this is a recognized psychological phenomenon that happens when … partners face severe abuse and it can have the effect of being so dominating in their mind that it really undermines their complete responsibility for what they do.'" The court sentenced Dingwall to thirty months and one day in prison and three years of supervised release, treating the evidence of severe abuse as "extraordinarily mitigating." Dingwall appeals the denial of her motion in limine.

III. *Analysis*

    A. *Standard of Review*

Decisions on the admission or exclusion of evidence are ordinarily reviewed for abuse of discretion. *United States v. Wade*, 962 F.3d 1004, 1011 (7th Cir. 2020). But because the district court denied the motion based on its determination that, as a matter of law, Dingwall had failed to meet the requirements to introduce evidence needed to support the duress defense, we review de novo. *Id.*; see generally *United States v. Vargas*, 689 F.3d 867, 877 (7th Cir. 2012) (review is de novo where defendant objects to court's refusal to give theory-of-

defense instruction), abrogated on other grounds, *Burton v. City of Zion*, 901 F.3d 772, 778 (7th Cir. 2018).

B. *Introduction of Expert Evidence for the Duress Defense*

Dingwall's duress defense faces major obstacles. Chief among them is that when she committed the three robberies, Stanley was not physically present. For the first robbery, he waited in the car out of sight after handing Dingwall his gun and sending her in to rob the store. For the second and third robberies, he was at work, though after having continued his violent physical abuse, threats, and demands for money. Furthermore, Dingwall held a gun for each robbery. A jury might well find that a reasonable person in the situation did not reasonably fear *imminent* violence and had reasonable alternatives to committing the robberies, such as calling police for help.

Dingwall argues, however, that a reasonable person *in her situation*, including the repeated violent abuse and psychological pressure from Stanley, could fear imminent death or serious injury if she did not commit the robberies and could not see other reasonable alternatives to the crimes. She argues that she needs expert testimony from Dr. Hanusa to explain her situation to a jury, including how abuse affects victims' perceptions, choices, and behavior. We have not decided before on the admissibility of such evidence. See *United States v. Madoch*, 149 F.3d 596, 600 (7th Cir. 1998) ("We therefore express no opinion on whether the pattern of abusive behavior to which [the defendant] testified could ever support a different instruction on intent or coercion, because anything we said would necessarily be speculative.").

### 1. *Other Courts' Approaches to Expert Evidence on Battering and its Effects*

Thoughtful opinions from our colleagues in other circuits provide useful guidance on the duress defense where the person posing the threat is not always physically present. In *Dando v. Yukins*, 461 F.3d 791 (6th Cir. 2006), the petitioner's boyfriend was armed and had threatened to kill her. She helped him commit a series of armed robberies and assaults over the course of a day, but she was not always in his immediate physical presence. The Sixth Circuit concluded that her counsel had been deficient in advising her to plead no-contest without first investigating through an expert the possibility of a duress defense based on battered woman's syndrome. *Id.* at 800. The court reasoned that "evidence of Battered Woman's Syndrome can explain why a reasonable person might resort to such actions given a history of violent abuse and the imminent violent threats." *Id.* at 801. The court explained that "the theory of Battered Woman's Syndrome is not at odds with a reasonableness requirement—if anything, evidence of Battered Woman's Syndrome can potentially bolster an argument that a defendant's actions were in fact reasonable." *Id.* The Sixth Circuit concluded that, where the defendant participated in a crime spree while accompanied by her heavily armed boyfriend who had threatened her life, "a reasonable person *in her situation* would likely have feared death or serious bodily harm." *Id.* at 802 (emphasis added).

The District of Columbia Circuit took a similar approach in *Nwoye II*, 824 F.3d 1129 (D.C. Cir. 2016), where the defendant had been convicted of extortion. Her abuser was not physically present, and in some instances was actually on the other side of the country when the crimes were committed, but he

was monitoring her actions and conversations through a remote electronic device. The defendant claimed that her counsel was ineffective by failing to offer expert testimony on the effects of intimate partner violence. The District of Columbia Circuit reversed the district court's finding of no prejudice and remanded for further proceedings on whether counsel's performance fell below an objective standard of reasonableness. *Id.* at 1141. Writing for the court, then-Judge Kavanaugh reasoned that because "the duress defense requires a defendant to have acted reasonably under the circumstances, and expert testimony can help a jury assess whether a battered woman's actions were reasonable," expert testimony can be "relevant to the duress defense." *Id.* at 1136. In words that fit this case, the court wrote: "Although a jury might not find the appearances sufficient to provoke a reasonable person's fear, they might conclude otherwise as to a reasonable person's perception of the reality when enlightened by expert testimony on the concept of hypervigilance." *Id.* at 1137 (quotation omitted; emphasis removed).

Similarly, in *United States v. Lopez*, 913 F.3d 807 (9th Cir. 2019), defendant Lopez's abuser was a convicted felon on the run from police. He had threatened her and her family, then accompanied her to a pawn shop and demanded that she buy a gun for him using her twin sister's identification. She did so, and he took the gun away and started on a new series of crimes that ended in his own death. Lopez was then charged with federal crimes for lying to buy a gun for her abuser. She offered expert testimony on intimate partner abuse to explain her actions and her failure to avoid committing the crimes. The district court excluded it, reasoning that the duress defense used an objective standard of reasonableness and that

the expert testimony would address only the defendant's subjective situation.

The Ninth Circuit reversed: "In determining whether a fear is well-grounded, the jury may take into account the objective situation in which the defendant was allegedly subjected to duress." 913 F.3d at 815 (quotation omitted; emphasis removed). Writing for the court, Judge Bybee explained: "expert testimony on [battered woman's syndrome] serves an important role in helping dispel many of the misconceptions regarding women in abusive relationships." *Id.* at 825. Further, "expert testimony may be characterized as explaining how a reasonable person can nonetheless be trapped and controlled by another at all times even if there is no overt threat of violence at any given moment." *Id.* at 820; see also *id.* (people who are battered "accurately perceive the seriousness of the situation before another person who had not been repeatedly abused might recognize the danger") (citations omitted; emphasis removed).

The Ninth Circuit also observed that most other federal and state courts have taken similar approaches to admitting such expert testimony on battering and its effects. *Id.* at 821, citing *Nwoye II*, 824 F.3d at 1138, and *Dando*, 461 F.3d at 801, as well as *United States v. Ramirez*, 87 Fed. R. Evid. Serv. 1154, 2012 WL 733973 (D.P.R. Mar. 6, 2012); *United States v. Ceballos*, 593 F. Supp. 2d 1054, 1060–63 (S.D. Iowa 2009) (allowing expert testimony on battering and its effects to support duress defense); *United States v. Marenghi*, 893 F. Supp. 85, 95–97 (D. Me. 1995); *Commonwealth v. Asenjo*, 477 Mass. 599, 82 N.E.3d 966, 973–74 (2017); *Wonnum v. State*, 942 A.2d 569, 572–73 (Del. 2007); and *State v. Williams*, 132 Wash. 2d 248, 258–60, 937 P.2d 1052, 1058 (1997). See also *United States v. Navedo-Ramirez*, 781

F.3d 563, 568 (1st Cir. 2015) (expert evidence on battering and effects could be relevant in proper case of duress but was not in particular case).

On the other hand, the Fifth and Tenth Circuits have affirmed the exclusion of such expert testimony, finding it does not address the objective reasonableness of the defendant's behavior. *United States v. Dixon*, 901 F.3d 1170, 1183–84 (10th Cir. 2018) (courts may not consider whether defendant's conduct has been influenced by "non-tangible psychological conditions" such as battering and its effects because such a condition is not an "external, concrete" factor); *United States v. Willis*, 38 F.3d 170, 175, 177 (5th Cir. 1994) ("Evidence that the defendant is suffering from the battered woman's syndrome is inherently subjective" and therefore not relevant to a duress defense). See also *State v. Richter*, 245 Ariz. 1, 8–10, 424 P.3d 402, 408–10 (2018) (reversing convictions where trial court excluded direct evidence of intimate partner violence, but holding that expert evidence on battering was not admissible under state law); *State v. B.H.*, 183 N.J. 171, 199, 870 A.2d 273, 290 (2005) (expert evidence on battering not relevant to "reasonable firmness" prong of duress defense but could be relevant to defendant's credibility and to explain why she would remain with abuser and ought not be perceived as acting recklessly).

2. *The Government's Shifting Approaches to the Expert Evidence*

The government's position in this case seems inconsistent with its position in similar cases. For example, the government introduced expert evidence of battering and its effects in *United States v. Young*, 316 F.3d 649, 657–59 (7th Cir. 2002), where the defendant was charged with kidnapping and

interstate domestic violence (beating and threatening to kill his partner). At trial the victim recanted her account of the violence, threats, and kidnapping. In response, the government introduced her grand jury testimony and, to explain the victim's about-face, offered the expert testimony of a professor in nursing who specialized in treating crime victims. She testified that such recantations are common by victims of domestic violence, especially when they do not perceive a means of escape from the violence. We affirmed, finding that expert testimony about battering and its effects was "both reliable and helpful in a case such as this one" because the "testimony was highly probative as to why [the witness] recanted on the stand." *Id*. at 658–59. Accord, *Arcoren v. United States*, 929 F.2d 1235, 1241 (8th Cir. 1991) (affirming admission of expert testimony on battering and its effects to explain witness recantation; it was "immaterial whether the testimony is presented by the prosecution or by the defense").

In prosecuting human trafficking cases, the government often introduces expert evidence to explain how traffickers systematically and intentionally coerce their victims by inflicting psychological control and fear. See, e.g., *United States v. Young*, 955 F.3d 608, 615 (7th Cir. 2020) (affirming admission of government's expert testimony "defin[ing] key terms and explain[ing] common sex-trafficking dynamics" as "reliable and helpful for the jury"); *United States v. Alzanki*, 54 F.3d 994, 1006, 1009 (1st Cir. 1995) (affirming admission of expert testimony on the "behavior of abuse victims generally").

A good illustration from another ruling on a pretrial motion in limine appears in *United States v. Jackson*, 2021 WL 1570613, at *3–4 (N.D. Ind. Apr. 22, 2021), where the defendant was charged with sex-trafficking of a minor, along with

related crimes. As with Dingwall's duress defense, a key issue in *Jackson* is whether someone who committed crimes (commercial sex acts in *Jackson*, and robberies here) acted out of coercion or free will. The government was required to prove in *Jackson* that the defendant knew or recklessly disregarded that force, threats of force, fraud, coercion, or any combination of such means would be used to cause the alleged victim to engage in a crime. The government proposed to offer expert testimony about the "cycle of force, fear, and coercion that distinguishes human trafficking from prostitution" by explaining how the trafficker may use physical abuse and psychological tactics to continue exploitation, in essence by overcoming the victim's free will. Judge Leichty denied the defendant's motion in limine to exclude the expert testimony:

> The proposed testimony is helpful here because it enables the jury to assess the alleged victim's credibility, to understand the concepts and dynamics of exploitation and trafficking *invariably foreign to the jury's experience, to decide whether the alleged victim acted voluntarily or under coercion*, and to evaluate whether the alleged victim's experience was typical or implausible.

2021 WL 1570613, at *4 (emphasis added). That reasoning applies here, as well.

Similarly, in prosecutions for sexual abuse of minors, courts frequently admit expert evidence about "grooming" to help the jury understand how sex abusers of children develop an emotional relationship with a minor before initiating sexual activity. See, e.g., *United States v. Romero*, 189 F.3d 576, 582 (7th Cir. 1999) (affirming district court's admission of expert testimony explaining a child molester's methods to attract

and abuse children to help jury understand how some child molesters operate).

As the government's positions in these similar contexts demonstrate, there may be significant value in the evidence Dingwall seeks to introduce. Expert evidence of battering and its effects can help to explain to a jury, likely unfamiliar with the topic, how victims of battering may respond to their circumstances. The government cannot have it both ways, admitting such evidence to explain its own witnesses' behavior but excluding the evidence when it is helpful to an accused defendant. See, e.g., *State v. Frost*, 242 N.J. Super. 601, 612 (N.J. App. 1990) (affirming evidence of battering offered by the government: "It would seem anomalous to allow a battered woman, where she is a criminal defendant, to offer this type of expert testimony in order to help the jury understand the actions she took, yet deny her that same opportunity when she is the complaining witness and/or victim and her abuser is the criminal defendant.").

We agree with *Lopez*, *Nwoye II*, and *Dando* that expert testimony on battering and its effects may be offered in support of a duress defense because it may help a jury understand the objective reasonableness of a defendant's actions in the situation she faced, which included the history of violent and psychological abuse. As those opinions explain, the questions of reasonableness posed by the duress defense are not asked and answered in the abstract. The judge or jury must consider the defendant's situation, and the reasonableness of her actions and choices may be considered in light of what is known about the objective effects of such violent and psychological abuse, not on the particular defendant but more generally. "A reasonable man is not likely to fear death or great bodily

injury when a person advances towards him during a verbal altercation. However, a woman who has been repeatedly beaten and once choked into unconsciousness by her husband is likely to fear death or great bodily injury when he advances towards her during a quarrel." Stephanie M. Wildman & Dolores A. Donovan, *Is the Reasonable Man Obsolete?: A Critical Perspective on Self-Defense and Provocation*, 14 Loy. L.A. L. Rev. 435, 445–46 (1980–81).

C. *Consideration of Mental Conditions*

The government urges us to apply a narrower standard for objective reasonableness such as that adopted by the Tenth Circuit in *Dixon*, permitting consideration of only "external, concrete factors unique to her" but not whether her "conduct has been influenced by non-tangible psychological conditions that ostensibly alter the defendant's subjective beliefs or perceptions." Gov't Br. at 33, citing *Dixon*, 901 F.3d at 1183. The government provides two examples of conditions that would be permissible: colorblindness, which a court may use to consider "what a reasonable person who is unaware of certain color-related facts might do," and a photographic memory, which a court may use to consider what a reasonable person "with access to such knowledge might do." *Id*.

If anything, this line of reasoning supports the defendant's position. Evidence of the existence of a mental condition should be admissible to help the factfinder consider how a reasonable person with that condition may have responded to the situation.[5] We agree with the government that "the

---

[5] Such mental conditions are not limited to the government's examples of colorblindness and photographic memory. Such mental conditions might also include bipolar disorder, major depressive disorder, post-

mental processes themselves are a subjective factor; the inquiry could not consider the particular defendant's own value judgments and prudential calculations of the information she perceives." *Id*. But the factual existence of a mental condition is an "external, concrete factor" that may be demonstrated with evidence, and that objective condition carries with it relevant factors that can assist in the reasonable person inquiry.[6]

Assessing the influence of mental conditions on objective reasonableness and subjective perceptions does not lend itself well to bright lines. But we believe courts are capable of distinguishing between expert evidence of battering and its effects to determine how a reasonable person who has been battered may have perceived a situation (objective and permissible), and expert evidence of how the defendant herself actually perceived the situation (subjective and not permissible).

D.  *Other Personal Circumstances Under Objective Standards*

If we look beyond battering and its effects, courts facing questions of objective reasonableness in other contexts allow similar evidence about a person's history and circumstances

---

traumatic stress disorder, autism spectrum disorder, or the impact of battering, although this opinion is limited to battering and its effects.

[6] We do not base our decision on the objective physical roots of mental conditions. See generally Shitij Kapur et al., *Why Has it Taken So Long for Biological Psychiatry to Develop Clinical Tests and What to Do About It?*, 17 Molecular Psychiatry 1174, 1174 (2012) (discussing the field of biological psychiatry, which "aims to understand mental disorders in terms of the biological function of the nervous system"); Editorial, *The Validation of Psychiatric Diagnosis: New Models and Approaches*, 152:2 Am. J. Psychiatry 161, 161 (Feb. 1995) (reviewing an "array of methods that are being applied to track mental illnesses back to the organ system from which they emanate, the brain, and to the aberrations occurring at a molecular level in DNA").

to evaluate actions and choices. Such evidence may inform courts' understanding of how a person may have perceived the situation without rendering that analysis subjective. For example, in a human trafficking case, one question was whether it was reasonable for the victim to have felt threatened and imprisoned under the circumstances. *United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008). The standard was objective reasonableness under the circumstances the victim faced. We affirmed the defendants' convictions:

> The evidence showed that the Calimlims intentionally manipulated the situation so that Martinez would feel compelled to remain. They kept her passport, never admitted that they too were violating the law, and never offered to try to regularize her presence in the United States. Their vague warnings that someone might report Martinez and their false statements that they were the only ones who lawfully could employ her could *reasonably* be viewed as a scheme to make her believe that she or her family would be harmed if she tried to leave. That is all the jury needed to convict.

*Id.* (emphasis added). We considered evidence of actions and statements and opined on how those objective facts could "reasonably be viewed" without transforming the objective inquiry into a subjective one. *Id.*

In child sexual abuse cases, courts consider objective facts such as the communications between the defendant and the intended victim to establish the existence of deliberate action, again without transforming the objective inquiry into a subjective one into the defendant's actual thoughts. See *United*

*States v. Chambers*, 642 F.3d 588, 593–94 (7th Cir. 2011) (detailing, at length, significant evidence that the defendant was grooming the intended victim for sexual activity, even though their plans never culminated in a meeting).

A little further afield from the problem here, hostile-environment employment discrimination cases have both objective and subjective elements: the work environment must have been objectively hostile and the plaintiff must have perceived it, subjectively, as hostile. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20, 21–22 (1993). Courts' treatments of the objective element illustrate a similar approach that considers the circumstances the plaintiff faced, including the plaintiff's personal characteristics. It would make little sense to imagine how an "objectively reasonable" male manager might perceive sexist comments in the workplace where the actual victim was a female manager. Naturally the factfinder should consider whether a "reasonable woman manager under like circumstances would have been offended." *Id.* at 20.

Similarly, courts consider an employee's race when determining whether racist comments in the workplace create an objectively hostile work environment. It would make little sense for a court to ask how a hypothetical white person might have interpreted the racial epithets and racialized threats directed at a person of color. See, e.g., *Cerros v. Steel Technologies, Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002) ("Nor is there any question that a reasonable person would perceive that the graffiti, remarks, and other harassing conduct were based upon his race and ethnicity."); *Henderson v. Irving Materials, Inc.*, 329 F. Supp. 2d 1002, 1006–08 (S.D. Ind. 2004) (denying summary judgment for defendant on plaintiff's

hostile environment claim and describing racial history inherent in threats aimed at plaintiff).

We could continue with many more examples of courts considering individual circumstances when applying objective standards, but will stop with just one more. In civil cases against police officers for allegedly excessive force, the central issue is whether the officers' actions were objectively reasonable under the circumstances. In such cases, both sides routinely offer expert opinions. While the precise scope of permissible opinions is litigated often, the general use of such opinions is widely accepted. See, e.g., *Calusinski v. Kruger*, 24 F.3d 931, 937 (7th Cir. 1994) (affirming admission of defense expert's opinions); *Kladis v. Brezek*, 823 F.3d 1014, 1019 (7th Cir. 1987) (same); *Richman v. Sheahan*, 415 F. Supp. 2d 929, 945–51 (N.D. Ill. 2006) (detailed pretrial consideration on scope of such opinions from defense expert); *McLoughan v. City of Springfield*, 208 F.R.D. 236, 239 (C.D. Ill. 2002) (detailed pretrial consideration of such opinions from plaintiff's expert).

In all of these types of cases, expert testimony may inform a jury about the objective reasonableness of a person's response, especially to unusual circumstances beyond the scope of a typical juror's experience. The same is true of the objective reasonableness of Dingwall's responses to the circumstances she faced here.

IV. *Dingwall's Duress Defense*

Expert evidence on battering and its effects could help Dingwall meet her burden on both elements of her duress defense, that "(1) she reasonably feared immediate death or serious bodily harm unless she committed the offense; and (2)

there was no reasonable opportunity to refuse to commit the offense and avoid the threatened injury." *Sawyer*, 558 F.3d at 711, citing *Jocic*, 207 F.3d at 892.

A. *Reasonable Fear of Imminent Violence*

Dingwall must first demonstrate that she reasonably feared imminent death or serious bodily harm. "Reasonableness—under both the imminence prong and the no-reasonable alternative prong—is not assessed in the abstract. Rather, any assessment of the reasonableness of a defendant's actions must take into account the defendant's particular circumstances." *Nwoye II*, 824 F.3d at 1137 (quotation omitted); see also 2 Wayne R. LaFave, *Substantive Criminal Law* § 9.7(b) (3d ed. 2020) ("the danger need not be real; it is enough if the defendant reasonably believes it to be real"). Violence against an intimate partner often follows a cyclical pattern, sometimes referred to as the "cycle of abuse," wherein the batterer beats the victim, apologizes, and then things return to "normal" until tension builds and the cycle starts again. See Lenore E. Walker, *The Battered Woman* at 55–70 (1979); Lenore E. Walker, *The Battered Woman Syndrome* (1984). Violence may strike at any time; it is not necessarily an isolated or explicit threat. Whether a battered person in Dingwall's shoes could have reasonably interpreted Stanley's continuous, predictable violence throughout their relationship and building up to her crimes as threats of "imminent violence" is exactly why expert evidence on battering and its effects could be helpful to the jury.

The government makes much of the fact, understandably, that Stanley was not physically present for any of the robberies. For the first robbery, he drove Dingwall to the gas station, handed her his gun, told her to "do it," and waited in the

car. For the second and third robberies, Stanley was at work. Proximity is not an explicit requirement under the "immi-nence" element, but it may appear implicit to a common-sense jury that has not heard expert evidence on battering and its effects and knows the defendant had a gun in her posses-sion.[7]

We agree with the District of Columbia, Sixth, and Ninth Circuits in *Nwoye II*, *Dando*, and *Lopez* and reject a strict phys-ical proximity test to establish a reasonable fear of imminent violence. The batterer in *Nwoye II* was not nearby, yet the court determined the threats were imminent due to the batterer's demands for prompt communication via telephone and even a Bluetooth headset. See *Nwoye II*, 824 F.3d at 1132. A jury may have concluded that Stanley's threats could have caused a reasonable person in Dingwall's situation to fear imminent vi-olence. Stanley regularly subjected Dingwall to unpredictable beatings, regardless of whether she provided him with the money he demanded. Between beatings, Stanley barraged Dingwall with near-constant angry, demanding, and de-meaning texts and phone calls, complaining if she did not re-ply right away. A jury could conclude that this demonstrates

---

[7] Jacquelyn C. Campbell et al., *Risk Factors for Femicide in Abusive Rela-tionships: Results from a Multisite Case Control Study*, 93 Am. J. Pub. Health 1089, 1092 (July 2003) (finding no clear protective effects for women who both owned guns and lived apart from their abusers, thus arguably limit-ing abusers' access to the gun); see generally Bob Velin, *Martin's Ex-Hus-band Gets 25 Years for Trying to Kill Her*, USA Today (June 26, 2012), http://content.usatoday.com/communities/gameon/post/2012/06/martins-ex-husband-gets-25-years-for-attempted-murder/1#.YO8HkxNKhOe (last visited July 30, 2021) (professional boxer was shot in her own home with her own gun by her husband, but survived).

an expectation of and level of control over Dingwall, even when physically separate.

The second issue Dingwall faces under this requirement is whether Stanley threatened imminent violence *unless* she committed the offense*s*. Under the duress defense's objective reasonableness standard, the question is how a reasonable person in Dingwall's shoes would have perceived Stanley's demands. The day before the first robbery, Stanley hit Dingwall in the eye socket with his gun after she failed to obtain money from her parents. Stanley was worried he was "hot" from committing several robberies himself, drove Dingwall to a Stop-N-Go, told Dingwall it was her "turn," told her to put on a sweatshirt backwards, and put his gun in her hand. The next day, Stanley repeatedly texted and called Dingwall angrily demanding more money. After she committed the second robbery, Stanley was "nice" to her but "demand[ed] degrading sex." The next day, Stanley warned Dingwall that she better have the remaining money by the end of the day and told her that Mobil would be a good gas station to "hit." Even though Dingwall committed the robbery, Stanley still beat her the morning after, strangling her in front of her daughter. A jury could conclude that Stanley's continuous and unpredictable violence against Dingwall, contrasted with his being "nice" when Dingwall did what he wanted, showed a level of manipulation and a style of communication that could lead a reasonable person in her situation to have interpreted Stanley's demands and behavior as a threat of imminent violence unless she committed each robbery. Expert evidence on battering and its effects may be helpful to a jury evaluating whether a reasonable person in Dingwall's position would have reasonably perceived an immediate threat of death or substantial injury from Stanley.

B.  *Lacked a Reasonable Alternative to Breaking the Law*

Dingwall must next demonstrate that she lacked reasonable alternatives to breaking the law. *Sawyer*, 558 F.3d at 711, citing *Jocic*, 207 F.3d at 892. On this element again, the government understandably emphasizes Stanley's physical distance and Dingwall's possession of the gun, arguing that Dingwall could have escaped, called for help, or otherwise refused to commit each crime. In the end, a jury may be persuaded by this argument. A reasonable person who has never been battered might conclude that there was an alternative to committing each robbery, but the circumstances Dingwall faced must be the focus here.

Again, physical proximity is relevant but not necessarily determinative of this second requirement. It is a factor, just as the degree of the coercer's control or surveillance over the defendant is a factor. See *Nwoye II*, 824 F.3d at 1136–37. The repeated abuse and its impact on an objectively reasonable person are crucial here. We see this as another example of how evidence of battering and its effects could help inform the jury.

V.  *The Government's Authorities*

A.  *Gang Violence*

In support of its arguments for excluding Dingwall's evidence, the government cites gang violence cases where defendants provided evidence only of generalized threats and other cases not presenting the special problems of repeated violence by an intimate partner. See *Sawyer*, 558 F.3d at 712; *United States v. Fiore*, 178 F.3d 917, 922–23 (7th Cir. 1999); *United States v. Myles*, 962 F.3d 384, 388 (8th Cir. 2020); *United States v. Navarro*, 608 F.3d 529, 533 (9th Cir. 2010). None of

those defendants had already been repeatedly, frequently, and recently beaten by their intimate partners. If a relative stranger makes a generalized, future threat, it may not meet the "imminent threat" requirement of the duress defense. But if the defendant's intimate partner, who regularly and brutally beats the defendant many times, often when money is short, makes a generalized or even implicit threat while money is short, a jury could reasonably view the threat as imminent.

The government cites one case involving intimate partner violence, *United States v. Sixty Acres in Etowah County*, where a wife contended that her husband's abuse put her under duress so that she did not consent to his use of the property to grow marijuana. 930 F.2d 857 (11th Cir. 1991). The wife presented evidence that her husband had been violent with her in the past and that he had beaten to death his previous wife. The district court dismissed the government's forfeiture claim on the ground that the wife did not consent to the use. The Eleventh Circuit reversed, finding no link between that past violence and the wife's inaction in response to her husband's use of the property to grow marijuana:

> In our view, circumstances justify a duress defense only when the coercive party threatens immediate harm which the coerced party cannot reasonably escape. The evidence at the hearing, however, showed only that [the wife] feared her husband. This generalized fear provokes our sympathy, but it cannot provoke the application of a legal standard whose essential elements are absent. Nothing in the record before us suggests that [the husband] threatened

> immediate retaliation to his wife if she refused
> to cooperate in the drug scheme which caused
> his arrest.

*Id.* at 861 (reversing district court's finding that wife was under duress because she failed to demonstrate an imminent threat).

The circumstances are different here. Crediting Dingwall's evidence, as we must in this appeal, she showed a much more immediate threat, not just a "generalized fear." She offered evidence of brutal, repeated, and regular physical and psychological violence linked to demands for money, instructions to "hit" a gas station, and comments that her partner was "hot" from committing robberies himself and that it was her "turn." The frequency of the violence and its relationship to demands for Dingwall to take specific illegal actions distinguish this case from *Sixty Acres*.

Similarly, none of the government's examples of cases where courts concluded that the defendant had reasonable alternatives to committing the specific offense involved intimate partner threats.[8] In many of these cases, the defendant had voluntarily put herself into the criminal milieu. There was an absence of history, particularly of violent history where threats were credible, between the participants. Those cases offer little guidance for this case, where we must assume Stanley abused Dingwall with sustained and brutal physical, sexual, and emotional violence.

---

[8] See *Sawyer*, 558 F.3d at 710–12; *Jocic*, 207 F.3d at 892; *United States v. Zayac*, 765 F.3d 112, 120 (2d Cir. 2014); *United States v. Jenrette*, 744 F.2d 817, 821 (D.C. Cir. 1984); *United States v. Gant*, 691 F.2d 1159, 1164 (5th Cir. 1982).

B. *Prison Cases Invoking the Necessity Defense*

The government also compares Dingwall's duress defense
to necessity defenses raised by incarcerated people who have
acted violently in prison, which we and other courts uni-
formly reject. See, e.g., *United States v. Sahakian*, 453 F.3d 905,
907 (7th Cir. 2006); *United States v. Tokash*, 282 F.3d 962, 970
(7th Cir. 2002); *United States v. Shields*, 774 F. App'x 434, 437–
38 (10th Cir. 2019); *United States v. Howe*, 289 F. App'x 74, 78–
79 (6th Cir. 2008); *United States v. Bello*, 194 F.3d 18, 26–27 (1st
Cir. 1999); cf. *United States v. Nailor*, 2018 WL 11256062, at *2
(W.D. Wis. Feb. 9, 2018) ("Although federal courts have not
gone so far as to bar the defense altogether, Nailor does not
cite any cases in which a federal court allowed a prisoner to
raise the defense in the context of a weapons charge.").

We are not persuaded by the comparison. Prisons pose
special dangers. Excusing otherwise criminal violence in a
prison based on a theory of duress or self-defense poses too
great a risk of uncontrolled violence. "If fear of potential fu-
ture violence were the appropriate standard … the absurd re-
sult would be that every inmate in any prison across the coun-
try could justify their possession of a weapon simply by artic-
ulating a fear of some future, possible, and generalized
threat." *Tokash*, 282 F.3d at 970. And that is simply unreason-
able. The prison cases are not helpful, let alone controlling,
guides for battering by an intimate partner. With intimate
partner violence, there is more than a "generalized fear" or
"rumor" of violence, and the assailant is known. The battered
person's fear that the violence may occur at some "unspeci-
fied time in the future" is part of the coercive effect. And the
risk of violent chaos in prison resulting from permitting incar-
cerated people to raise a duress defense with only a

"generalized threat" is profoundly different. See, e.g., *United States v. Haynes*, 143 F.3d 1089, 1091 (7th Cir. 1998) ("If prisoners could decide for themselves when to seek protection from the guards and when to settle matters by violence, prisons would be impossible to regulate. The guards might as well throw the inmates together, withdraw to the perimeter, and let them kill one another[.]").[9]

## VI. *The Roles of Judge and Jury*

This opinion should not be understood as changing the role of a district judge in deciding the admissibility of any evidence, including expert opinions, or in deciding how to instruct a jury about an affirmative defense. The judge remains the gatekeeper, if you will, ensuring that admitted evidence is relevant and that expert testimony meets the reliability and relevance requirements of Federal Rule of Evidence 702, and assessing whether the defense evidence, if believed, is legally sufficient to support the affirmative defense. At the same time,

---

[9] Dingwall also compares the duress defense to the self-defense excuse. Def. Reply Br. at 25. The self-defense excuse, like duress, requires evidence that the defendant faced imminent harm and had "no reasonable legal alternatives to using force in self-defense." *United States v. Waldman*, 835 F.3d 751, 756 (7th Cir. 2016). The self-defense excuse includes an important proportionality component: it is "the use of force necessary to defend against the imminent use of unlawful force." *Id*. at 754, citing *Haynes*, 143 F.3d at 1090. While summaries of the duress defense do not explicitly require proportionality, we believe it is implicit within the requirement that the actor not have any reasonable alternative. We are also concerned about the difference between excusing the harm to an aggressor caused by a defendant acting in self-defense, and excusing the harm to an innocent third party caused by a defendant acting under duress. This concern and the proportionality concern may be appropriate subjects for jury instructions.

in these cases as in any other, the judge acting as a gatekeeper must take care not to take over the role of a jury in weighing evidence and deciding the credibility of testimony.

As the Supreme Court taught in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595–96 (1993), a judge considering expert opinions must focus "solely on principles and methodology, not on the conclusions that they generate," and should keep in mind the role of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" in dealing with "shaky but admissible evidence." See also, e.g., *United States v. Truitt*, 938 F.3d 885, 889–91 (7th Cir. 2019) (affirming Rule 702 exclusion of expert proffered on group dynamics to explain defendant's repeated claims for fraudulent tax refunds). Similarly, the judge's role is not to decide the merits of the affirmative defense or the credibility of supporting evidence but to decide whether the evidence is sufficient to allow the jury to decide it. E.g., *United States v. Bailey*, 444 U.S. 394, 415–16 (1980).

In this case, the district court ruled before trial that the defendant's proffer of evidence was not legally sufficient. We have explained why we disagree with that assessment, giving full credence to defendant's evidence. As with any pretrial ruling on the admissibility of evidence, however, such a pretrial ruling may be revisited based on the actual evidence presented at trial. Cf. *United States v. Davis*, 845 F.3d 282, 287 (7th Cir. 2016) (government's trial evidence did not fulfill pretrial "*Santiago* proffer" in key respects for admission of co-conspirator statements; district court did not err by reconsidering admissibility and finding that foundations were sufficient for admission). In addition, because the district court ruled on a broad basis that Dingwall's duress proffer was not sufficient

in this case, the government might not have had occasion to raise more specific challenges to her evidence.

Consistent with the Ninth Circuit in *Lopez*, the District of Columbia Circuit in *Nwoye II*, and the Sixth Circuit in *Dando*, we conclude that Dingwall should not have been denied the opportunity to offer evidence of battering and its effects, including expert opinions, to support her duress defense. Such evidence can help inform the factfinder how an objectively reasonable person in her circumstances may behave. This decision does not guarantee Dingwall's success with her duress defense; our decision here is only about whether evidence was properly excluded on the ground that it was not relevant or sufficient to support a duress defense. This decision is not intended to preclude specific objections to specific portions of her evidence. We REVERSE Dingwall's convictions and sentence and REMAND so that Dingwall may withdraw her guilty pleas, knowing that her proffered evidence of battering and its effects may not be excluded on the broad relevance and sufficiency reasons given by the district court.

KIRSCH, *Circuit Judge*, concurring in the judgment. I agree that evidence of battering and its effects can be relevant to whether a battered person's actions were objectively reasonable under the circumstances, and that physical proximity is sufficient, but not always necessary, to make an initial showing on the imminence prong of the duress defense. See *United States v. Nwoye*, 824 F.3d 1129, 1136–38 (D.C. Cir. 2016). I write separately for two reasons: first, to highlight the limits of our holding; second, to emphasize the district court's role to decide in the first instance whether Dingwall's evidence should be admitted at trial as well as whether she is entitled to a duress jury instruction on each count. We do not hold that any of Dingwall's evidence should be admitted at trial or that she is entitled to a duress jury instruction. Those questions must be answered by the district court in the first instance on remand.

I

We are "a court of review, not first view." *Cutter v. Wilkinson*, 544 U.S. 709, 781 n.7 (2005). If we are convinced that a lower court applied the incorrect legal standard, we should reverse, announce the proper standard, and remand for the lower court to apply it. See *Moore v. Texas*, 136 S. Ct. 666, 674 (2019) (Alito, J., dissenting). We hold today that the standard the district court applied is the incorrect standard. The district court held that our precedent tied its hands, preventing it from considering the evidence of battering and its effects as Dingwall presented it. The district court's full explanation of its holding was as follows:

> I agree with the parties here that the elements
> are that I'd [sic] have to show that the danger
> was so imminent, meaning in the next moments,

and that there were no legal alternatives. And I think that that's not met here. And I don't see a foundation in the precedent for me to really consider kind of the broader coercive impact of this history of abuse.

R. 33 at 3. Stated differently, the district court did not consider the evidence in the way Dingwall hoped because it believed it could not consider it. We go no further than instructing that district courts are not barred by our caselaw from considering testimony of battering and its effects when a criminal defendant attempts to offer a duress defense.

The district court, now armed with the proper standard, must act as the gatekeeper for evidentiary admissibility at each stage of trial. This involves, among other things, deciding in the first instance whether Dingwall's proffer meets the initial sufficiency showing on each count and ultimately whether a duress instruction is appropriate—and if so, as to which counts—at the close of the evidence.

## II

Accordingly, the district court will have to make several decisions on remand. First, once Dingwall proffers her duress defense to the district court before trial, the court must decide whether the proffer—accepted as true—presents sufficient evidence to show she can meet each element of the defense. See *United States v. Tokash*, 282 F.3d 962, 967 (7th Cir. 2002). If sufficient, Dingwall may present her evidence to the jury. See *id.* As the majority acknowledges, the district court governs each admissibility decision concerning evidence, both lay and expert, that Dingwall seeks to admit. See, *e.g.*, *United States v. Brown*, 973 F.3d 667, 703 (7th Cir. 2020) (expert testimony);

*United States v. Bowling*, 952 F.3d 861, 868 (7th Cir. 2020) (lay testimony). The district court then must decide, after adversarial testing of Dingwall's evidence, whether to give a jury instruction on the duress defense and as to which counts. In doing so, the district court must determine whether: "(1) the defendant's proffered instruction is a correct statement of the law; (2) the theory of defense is supported by the evidence; (3) the theory of defense is not part of the charge; and (4) the failure to include the instruction would deny the defendant a fair trial." *United States v. Sawyer*, 558 F.3d 705, 710 (7th Cir. 2009).

The majority opinion makes references to what "a jury" might conclude,[1] which could be read to suggest that Dingwall's proffered evidence has cleared (at least) the sufficiency threshold. It has not, because the district court has not yet said that it has.

Dingwall very well may not be entitled to a duress defense on all counts. As the majority notes, Dingwall faces several challenges in presenting her duress theory, particularly on counts 2 or 3 (the second and third armed robberies). The district court must determine whether she has presented legally sufficient evidence that she had no reasonable, legal alternative to committing armed robbery (including that the crime was proportional to the threat of harm, see *supra* at 32 n.9) on January 7 and 8, 2019, when under her version of the events: Stanley did not ask her to commit a crime, let alone *armed* robbery, but instead demanded money which Dingwall attempted to get from her mother; Stanley was at work at the time of Dingwall's crimes; Dingwall had exclusive access to

---

[1] For instance, in its introduction, the majority writes, "Those facts present questions for a jury, however." *Supra* at 2.

Stanley's only firearm; and Dingwall had a relationship with Stanley's mother that, at least according to her proffer, appeared to be friendly and supportive (Dingwall confided in Stanley's mother as late as December 2018 after Stanley battered her and fired his gun into her mattress, and Stanley's mother offered help and a place for Dingwall to stay). See Separate App'x at 148–49.

Moreover, as the majority recognizes when citing to *United States v. Davis*, 845 F.3d 282 (7th Cir. 2016), we do not know what the evidence will be at trial. We only know what Dingwall has *proffered* the evidence to be. We accept her proffer as true, but as is often the case with proffers, there are inconsistencies between her statement and other evidence she submitted. For instance, Dingwall stated that on January 7: "Even though I was not being beaten he was still demanding degrading sex, but I honestly was so checked out that I did whatever he said or wanted. I just remember that night being particularly degrading and him making me [engage in an unwanted sex act.]" Contrast her statement with the following text message she sent to Stanley in the afternoon on January 8: "Ur [sic] sex game was on point last night baby!!! My heads [sic] still spinning ❤️[.]"

The references to a "jury" throughout the majority opinion are not meant to usurp the role of the district judge in this case (or in any other case) or to decide in the first instance whether Dingwall has met the stringent legal requirements to argue her defense to the jury at trial. That is a decision left to the district court on remand.