# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3827-24

J.D.[1],

    Plaintiff-Respondent,

v.

C.N.D.,

    Defendant-Appellant.

_____

Submitted June 4, 2026 – Decided June 29, 2026

Before Judges Mawla and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FV-04-0185-26.

Kahn & Lehrfeld, LLC, attorneys for appellant (Cori H. Lehrfeld, on the brief).

Donelson, D'Alessandro & Peterson, LLC, attorneys for respondent (Linwood H. Donelson III, on the brief).

PER CURIAM

_____
[1] We use the parties' initials pursuant to Rule 1:38-3(c)(12).

Defendant C.N.D. appeals from a July 24, 2025 final restraining order (FRO) entered against him in favor of plaintiff J.D. pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35. We affirm.

Each party testified at the FRO trial, and the court considered electronic evidence in the form of emails, texts, and a recording. The parties have been in a long-term marriage and have five children, all but one of whom are minors. The minor children ranged in age from five to fourteen years old and all resided with the parties. The predicate acts of domestic violence happened within one month of plaintiff filing a complaint for divorce.

Plaintiff testified the relationship became tense after she filed the divorce complaint, and there was very little communication between the parties. On July 9, 2025, plaintiff told defendant she was going to stay with her sister and he "exploded."

Plaintiff recorded the exchange because she "knew he wasn't going to take it well that [she] was leaving." On the recording, defendant is heard saying: "F**k all of you guys," to plaintiff and the children. The children are heard imploring defendant to stop and attempting to calm him. After cursing at the family, defendant then said: "Don't worry. I won't be around much longer. I won't. You can have everything." Defendant insisted on wanting to "sit down

A-3827-24

and talk" to plaintiff. She refused and remarked the parties' living conditions were "unbearable" because defendant had placed cameras throughout the residence and had a private investigator follow her for more than six months. Defendant responded this was because plaintiff would not talk to him.

When it was clear plaintiff did not want to discuss things with defendant, he resumed cursing at her and attempted to enlist the children in his tirade by instructing one of them to tell plaintiff what she thought of plaintiff. When this did not work, defendant became angry and slammed his head into the refrigerator, which caused him to fall to the ground. After defendant struck the refrigerator, plaintiff stopped recording and called 9-1-1.

Defendant left before the police arrived, but they caught up with him. They took him to a hospital for evaluation, and he was released the next day.

Plaintiff tried to calm the children, and they remained in the marital residence until the next day. Given defendant's impending return, plaintiff panicked and left with the children for her aunt's home in Maryland. They left in such a rush, the children packed their belongings in trash bags. Plaintiff feared the consequences of calling 9-1-1 on defendant and speaking with the police. Even so, before leaving for Maryland, she emailed defendant to let him know where she and the children were.

3                                                        A-3827-24

Plaintiff's domestic violence complaint laid out a history of harassment, explaining that in the six months preceding the complaint, defendant placed her and the children under "constant surveillance" by installing cameras in the marital residence, having plaintiff followed, and sending her pictures of the places she visited as proof of the surveillance. At trial, plaintiff testified that during an argument defendant told her she was not allowed to leave him and he read off the dates and times she visited certain places. As an example of the surveillance, plaintiff told defendant she made an appointment to get new tires at a local tire center. However, plaintiff changed her appointment to a different branch. Defendant then confronted her for lying to him by sending her a text from the location where the original appointment had been made, showing she was not there. Plaintiff felt as if she was under constant surveillance and became "anxious all the time."

On July 10, 2025, police contacted plaintiff while she and the children were en route to her aunt's home in Maryland. They explained defendant had called them, even though plaintiff previously told defendant where she and the children were. On July 13, 2025, Maryland police visited her aunt's residence twice because of defendant. Plaintiff testified defendant had done this before when she and the children visited Maryland on June 27, 2025.

A-3827-24

Plaintiff and the children returned to New Jersey on July 14, 2025. She discovered defendant had cut the cable television line in the marital residence and changed the password on the family Netflix account.

Plaintiff testified defendant's conduct scared her because it was escalating. When the parties were dating, defendant accused plaintiff of cheating on him. During the marriage he displayed a distrust of plaintiff because he believed she had a relationship with another person five years before the parties were married. Plaintiff denied having such a relationship.

Plaintiff changed her telephone number due to defendant's behavior. She testified she needed an FRO since she was scared and could not live with defendant because of the harassment.

Defendant testified his actions were a result of plaintiff's physical and emotional abuse of the children. On July 9, he involved the children in the discussion because he was attempting to get the family into counseling. He claimed he was mediating between plaintiff and the children.

Defendant denied deliberately striking his head against the refrigerator, and instead, claimed he fainted because he had low blood oxygen levels and a low red blood cell count. He denied being suicidal. Rather, on July 9, his

A-3827-24

comments were borne of a desire to talk and avoid a divorce. Defendant conceded he was held in the hospital overnight.

On July 10, defendant claimed he called the police because he observed the children on camera leaving the marital residence with garbage bags. He heard one of the children say they were being forced to leave.

Defendant also conceded he called the police on June 27. He claimed plaintiff took the children to Maryland against their will. Defendant also asserted he called the police because another aunt was physically abusing the children.

Defendant denied hiring a private investigator or surveilling plaintiff. He installed the cameras because there were automobile break-ins in the neighborhood, and to keep an eye on the children. Although plaintiff was home with them, defendant feared she would fall asleep and leave them unattended.

Defendant denied tracking plaintiff to the tire center. He stopped there because it was on the way to his mother's house. Defendant argued he texted plaintiff about not being at the tire center because she was always lying to him. He also claimed she had an affair months, not years, before the marriage.

Defendant conceded plaintiff changed her telephone number and told him to communicate with her only by email. However, he claimed he was the victim

6

of domestic violence. He pointed to a prior domestic violence complaint he filed because plaintiff was allegedly abusing drugs. Defendant dismissed it because she sought treatment.

Defendant did not address the cut cable line allegation but admitted to changing the Netflix password because he received an alert someone in Philadelphia had signed into the account. Nonetheless, he claimed he gave the password to his father to pass on to the children.

After defendant completed his direct, cross, and re-direct testimony, the court questioned him about the recording of the July 9 incident and the events that followed. For the first time, defendant added he installed the cameras because plaintiff was abusing the children. On July 9, he enlisted the children in the discussion because their daughter was allegedly afraid to discuss her feminine issues with plaintiff.

The trial court found defendant committed harassment on July 9 and 10. Discussing N.J.S.A. 2C:33-4(c), it noted the recording revealed he was upset and confrontational, which evidenced an intent to harass and control. The surveillance cameras were also a part of defendant's desire to control the family. The escalation of what was an argument between plaintiff and defendant, which the court observed could have been a contretemps, turned into harassment and

7

domestic violence once defendant involved the children and then attempted to hurt himself. The court also concluded sending Maryland police to supposedly check on the children was a part of the pattern of harassment.

The court credited plaintiff's testimony she was afraid of defendant and needed an FRO. Her testimony about fleeing to Maryland was credible because the children had packed their belongings into trash bags, evidencing their alarm. The court also concluded plaintiff needed an FRO because defendant would not leave her alone once she arrived in Maryland.

## I.

Defendant argues the trial court's finding he committed harassment was erroneous because the court failed to outline how defendant's yelling and self-injury constituted an intent to harass plaintiff. He also challenges the court's finding plaintiff needed an FRO, because the court focused on the children rather than finding plaintiff was in immediate danger.

Our scope of review of Family Part orders is limited. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). We owe substantial deference to the Family Part's findings because of its special expertise in family matters. Cesare v. Cesare, 154 N.J. 394, 413 (1998). "Family Part judges . . . routinely hear domestic violence cases and are 'specially trained to detect the difference

between domestic violence and more ordinary differences that arise between couples.'" C.C., 463 N.J. Super. at 428 (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). Our deference is especially warranted when the evidence is largely testimonial and rests on a judge's credibility findings. Gnall v. Gnall, 222 N.J. 414, 428 (2015).

We will not disturb a trial judge's factual findings unless "they are so manifestly unsupported by or inconsistent with the competent, relevant[,] and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)). However, we review legal conclusions de novo. Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016).

The purpose of the PDVA is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007)); N.J.S.A. 2C:25-18. The PDVA authorizes judges to issue an FRO against a person "after a finding . . . is made that an act of domestic violence was committed by that person." N.J.S.A. 2C:25-29(a).

N.J.S.A. 2C:33-4(c) defines harassment as: "Engag[ing] in any other course of alarming conduct or of repeatedly committed acts with purpose to

alarm or seriously annoy such other person."  "A finding of a purpose to harass may be inferred from the evidence presented," based on "[c]ommon sense and experience."  State v. Hoffman, 149 N.J. 564, 577 (1997).  "[S]erious annoyance under subsection (c) means to weary, worry, trouble, or offend."  Id. at 581.

Having considered defendant's arguments in light of these principles and the record, we conclude there is no reason to disturb the trial court's findings. Although defendant complains about the extent of the findings, "it is well-settled that appeals are taken from orders and judgments and not from opinions . . . or reasons given for the ultimate conclusion."  Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001).

The record readily supports the harassment finding because the incident on July 9 was certainly not a contretemps.  Defendant's behavior intended to control plaintiff by using the children against her.  When that failed, defendant resorted to violent behavior by having the children and plaintiff witness his attempt at self-harm.  This conduct clearly fell within the ambit of N.J.S.A. 2C:33-4(c) because it objectively would "weary, worry, trouble, or offend" anyone observing it.  Hoffman, 149 N.J. at 581.

Defendant's attempts to explain his conduct by claiming he wanted to address a child's feminine needs and that his medical condition caused him to

10

fall into the refrigerator are unsupported by any objective evidence in the record. The recording makes no mention of the child's alleged fear of discussing her needs with plaintiff, and there was no medical evidence showing defendant fell because he had a low blood oxygen level or red blood cell count.

There is no evidence defendant had a valid purpose to have Maryland police check on the children, other than to attempt to exert control over plaintiff from afar. As we noted, defendant conceded plaintiff changed her telephone number and had asked him to communicate with her only by email. Plaintiff told defendant where she and the children were headed. His claims of abuse against her and the aunt have no support in the record. The court properly concluded defendant's only purpose in calling Maryland police was to harass plaintiff.

Finally, the trial court correctly interpreted the evidence when it concluded defendant was controlling and plaintiff needed an FRO to stop the harassment. Domestic violence "describes a pattern of abusive and controlling behavior." Corrente v. Corrente, 281 N.J. Super. 243, 246 (App. Div. 1995). It is characterized as a cycle of abuse, apology, reconciliation, and a return to normalcy, "until tension builds and the cycle starts again." United States v. Dingwall, 6 F.4th 744, 757 (7th Cir. 2021).

A-3827-24

The glimpse provided into the parties' relationship by the record evidences a pattern of abuse and control. Plaintiff characterized the July 9 incident as an explosion. Having listened to the entire testimony, the trial court observed: "Everybody's in the frying pan because of [defendant]'s conduct." It also credited plaintiff's testimony she and the children fled to Maryland, carrying their belongings in trash bags, as evidence of her alarm. The court's conclusion "[d]efendant is of a[n] inherent need to try to control the situation regarding the end of his marriage, which is forcing him to go out of control" is amply supported by the record. The trial court understood the domestic violence dynamic and defendant has given us no cause to second-guess its decision.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3827-24